**KENNECOTT COPPER CORPORATION v. STATE TAX COMMISSION.**

**SILVER KING COALITION MINES CO. v. SAME.**

Civil Actions Nos. 671, 680.

District Court, D. Utah, Central Division.

Oct. 30, 1944.

C. C. Parsons, of Salt Lake City, Utah, for Kennecott Copper Corporation.

R. J. Hogan, of Salt Lake City, Utah, for Silver King Coalition Mines Co.

A. H. Nielsen and W. L. Skanchy, both of Salt Lake City, Utah, for State Tax Commission.

JOHNSON, District Judge.

The decision of these cases depends upon the meaning and fair interpretation of the State and the United States statutes applicable to the situation.

These various statutes have been read and re-read during the progress of this discussion, and I will not have them re-read at this time, but they may be considered incorporated in the remarks that I shall make respecting the cases.

In this connection I will say that a taxing body, such as the Utah State Tax

Commission, is charged with the duty of collecting all taxes that may be properly assessed and collected under the laws of the State, and it becomes its duty as such to solve powers that are doubtful in favor of the state. That is the universal practice, so far as I have observed, of all taxing bodies, including the revenue department of the United States. So that it results in many cases an appeal must be made to the courts to determine what is the proper meaning and construction of the statutes under which taxes have been levied and assessed. That is the case here.

The State statute provides for the collection of an occupation tax on the gross sales or value of the metals produced by mining companies, and so in these cases the State Tax Commission has proceeded to levy assessments upon the gross amount which it claims has been paid to or received by the respective mining companies covering the period involved, and which assessments have been paid under protest by plaintiff companies.

The tax or levy in these cases has this anomaly: For the bulk of the metal values produced it is agreed, using copper as an illustration, that it has a valuation or sales price of twelve cents a pound—the relative proportion of these two prices I am unable to state offhand—but for that which was produced in excess of this twelve cents per pound price they are here claiming a price of seventeen cents, resulting from a payment made, not by the purchasers of the metals in question, but by the United States Government.

I just asked counsel for the State Tax Commission whether that extra, additional payment was made for the benefit of the purchasers of these metals, or for the benefit of the seller of the metals. Not holding him to his answer, I am, however, of the opinion that he answered correctly when he said it was for the benefit of the sellers, that is to say, of the plaintiffs in these actions.

So that we have this question submitted for determination: Was that extra five cents per pound for this additional production any part of the purchase price or the sales price of these metals?

Certainly, so far as the relation between the purchaser and the seller or the Government is concerned, it constituted no bargain contract price or part of the price. Then what was it?

To that I think we must look to the statutes of the United States. The State of Utah, neither by its Legislature nor by its Tax Commission, can say what the United States Government shall do with its own money. That is a matter that must be determined by Congress, and its determination of that question is final and conclusive upon all the courts of the nation, State and National.

Now what was the purpose of Congress in enacting this sort of legislation providing for the payment of this particular subsidy?

The statute itself does not recite, but it does contain the word "subsidy", and subsidy, speaking generally, is something, usually money, donated or given or appropriated by the Government through its proper agencies—in this country by the Congress. Congress may, and has as here, in these war times used many sub-agencies of the Executive Department to carry out the laws enacted by it.

Now, what did Congress mean and intend when it authorized the payment of subsidies under the conditions specified in the Act? Was it appropriated for the purpose of relieving the buyers of the products or metals indicated from the payment of the market value of the metals in question?

In that connection we must bear in mind that Congress has authorized the Price Control Administrator to make and fix ceiling prices on practically all articles in use in this country. In these cases the Administrator fixed prices at which these metals could be sold, copper for instance, at twelve cents a pound. Now these prices, whatever they may be in any particular case, we must presume were based upon a fair consideration of what would be a fair and just price to be received and paid for the article in question. Can we say that the fixing of the price of copper was a mere subterfuge on the part of the Administrator, and that the real price that he should have fixed, if he had been honest about it, was seventeen cents? Such a construction given to his acts would be to question his honesty, it seems to me. Twelve cents per pound for copper when it was fixed we must accept as the fair market value to be paid for this metal and to be received by the producer of it, and with respect to the bulk of the production in these cases the

producer did receive and the purchaser did pay that price. Now the Government, for its own reasons, and without consulting the Legislature of the State of Utah or its Tax Commission, made these extra and additional payments, and the Congress called it a subsidy, which by its very terms means a gift from the Government to these producers. True when it is paid, it is money received and used by the producers, as they use any other money, and it might very well be that in the determination of income, the courts, in the construction of an income statute, or the Congress in passing such a statute, may be held to have intended that the States, or the Government itself, should include that payment in the amount upon which income taxes should be assessed. But this is not an income tax. This is an occupation tax upon the gross sales of these metals by these producers, and who are paid money as a subsidy by the United States.

It is recited and reiterated by some of the Government representatives who have written about this matter, that these payments were made to meet the additional cost and expense that would be incurred by producers in making this extra effort to add to its product. Well, I am inclined to the view that these gentlemen were entirely right in that construction of the statute as to the purpose which Congress had in authorizing these subsidy payments.

In my view of the situation it would be, and is, a strained construction to make these payments, although based upon five cents, or some other amount, per pound for the metal in question, a part of the purchase price so as to bring it within the terms and meaning of the State statute under which the Tax Commission in these cases has acted.

In that connection, however, I want to repeat that I have no criticism to make of the Tax Commission in raising this question. It is the duty of the Tax Commission to collect all the taxes that are authorized under the State statute, and if it had any doubt about it, it solved it by levying this tax, and with these resulting law suits. But I am very clearly of the opinion that neither the state statute nor the Federal statutes give the Tax Commission any authority whatever to make these levies and collections.

I will state to the jury that the court, after listening to the argument of counsel and being as fully advised as may be, is of the opinion that the plaintiffs in these actions are entitled to judgment as prayed for.

The jury directed by the court to find for the plaintiffs in the amounts indicated in the verdicts.