246 P.2d 871

STATE TAX COMMISSION et al. v. MIAMI COPPER CO.

No. 5434.

Supreme Court of Arizona.

July 14, 1952.

Fred O. Wilson, Atty. Gen., Charles C. Stidham, Asst. Atty. Gen., for appellants.

Morris & Malott, of Globe, for appellee.

UDALL, Chief Justice.

The defendant, State Tax Commission, appeals from a judgment awarded Miami Copper Company, plaintiff-appellee, for the recovery of excise taxes theretofore paid by it under protest. For convenience sake we shall refer to the appellant as the "Commission" and to the appellee as plaintiff or the "Company".

Although five separate appeals have been filed by the Commission, our numbers 5434, 5435, 5436, 5437, 5438, by stipulation of the

parties they were consolidated for presentation to this court. 74 Ariz. 244, 246 P.2d 877; 74 Ariz. 246, 246 P.2d 879; 74 Ariz. 247, 246 P.2d 879; 74 Ariz. 247, 246 P.2d 880. The legal questions presented are identical although the tax levied against the plaintiff Sam Knight Mining Lease, Inc., 74 Ariz. 244, 246 P.2d 877, is based under a different subdivision of the statute. None of the facts are in dispute.

The additional assessments levied by the Commission, covering the period January 1, 1942 to December 31, 1946, were paid under protest by the five companies involved in these appeals, and the moneys so paid are presently impounded in the Tax Protest Fund as provided in the Act. After a formal hearing the Commission denied the protests and separate actions were brought in the superior court of Gila county to recover these impounded tax moneys. In each case both the plaintiff and defendant moved for a summary judgment. The motions of the Commission were denied and those of the mining "companies" were granted and judgments were duly entered thereon. These appeals followed.

A procedural matter, involving the question as to whether the Commission timely appealed from these judgments, will first be considered. The lower court on May 26, 1950, after granting the plaintiffs' motions for summary judgments, directed the clerk of the court to enter judgments for them as prayed for in their respective complaints. Appropriate entries were accordingly made in the judgment docket entering judgments, on June 1, 1950, for all the plaintiffs except the judgment for Sam Knight Mining Lease, Inc., which was entered on June 3, 1950. The Commission on July 25, 1950, more than twenty days after the entry of these judgments, filed their notices of appeal.

Plaintiffs, by their motions to dismiss filed in this court, directly raise the question whether section 21–1801 (Rule 72), as amended, A.C.A.1939, supersedes the provisions of section 73–1318, A.C.A.1939, insofar as the time within which an appeal may be taken to this court. Section 73–1318, supra, was enacted by the Twelfth Legislature as part of the Excise Revenue Act, Chap. 77, Laws 1935, A.C.A.1939, § 73–1301 et seq., and in part provides:

" * * * In any suit for recovery of taxes illegally collected, the court shall adjudge costs as in other civil actions. Either party to such suit shall have the right to appeal to the Supreme Court of Arizona as *now provided by law*, except that the time within which appeal may be taken shall be twenty (20) days." (Emphasis supplied.)

Section 21–1801, supra, was promulgated and adopted as part of the Rules of Civil Procedure for the Superior Courts of Arizona, by the Supreme Court of Arizona, effective January 1, 1940, and provides:

*"When an appeal is permitted by law* to the Supreme court, it shall be taken by notice filed with the Superior court

within sixty (60) days from the entry of the judgment or order appealed from, as provided by these rules. * * * " (Emphasis supplied.)

Concededly the notices of appeal were not filed within twenty days from the entry of the judgments, and if section 73–1318, supra, applies these appeals must be dismissed as this court would not have acquired jurisdiction to hear them. In re Gipson's Estate, 64 Ariz. 181, 167 P.2d 383.

Section 21–1801, supra, was adopted pursuant to the express authority granted to the supreme court by the legislature in the following statutes, Chap. 8, Laws 1939, now appearing in the A.C.A.1939 as sections:

"19–202. Rules of pleading, practice, and procedure.—The Supreme Court, by rules promulgated from time to time, shall regulate pleading, practice and procedure in judicial proceedings in all courts of the state, for the purpose of simplifying the same and of promoting the speedy determination of litigation upon its merits. Such rules shall not abridge, enlarge or modify the substantive rights of any litigant. * * *

"19–204. Existing statutes deemed rules of court.—All statutes relating to pleading, practice and procedure, existing at the time this act takes effect shall be deemed to be rules of court and shall remain in effect as such until

modified or suspended by rules promulgated pursuant to this act."

See also Burney v. Lee, 59 Ariz. 360, 129 P.2d 308.

Appellee's position is that the right to appeal was given by section 73–1318, supra, and that the legislature also conditioned the right upon its being taken within twenty days, which in these special proceedings is a matter of substantive law and cannot be repealed or changed by a rule of this court. They further urge that a general rule does not repeal a special statute unless the intent to do so is manifest and that where the two are not inconsistent they can exist side by side, and that repeals by implication are not favored.

■ We have repeatedly held that the right of appeal exists solely by virtue of an express constitutional or statutory provision. In other words, an appeal is a privilege granted by the constitution or statute and in the absence of an express provision granting the right, none exists. Smith v. Trott, 36 Ariz. 166, 283 P. 726, 728; In re Sears' Guardianship, 44 Ariz. 408, 38 P.2d 308.

■ In 21 C.J.S., Courts, § 172, subsection d, the principle is stated as follows:
"Subject to the principle that rules of court must not contravene constitutional or statutory provisions nor regulate substantive rights, courts may, especially where the legislature has provided no mode of procedure, adopt

reasonable rules of practice with respect to appeals and writs of error, such as the time within which the proceeding for review must be taken or exceptions be presented, and such as the time within which the notice of appeal be given; * * *."

We think the above draws a distinction between the right of appeal which is substantive and the time within which the notice of appeal must be filed. The latter is procedural and subject to reasonable regulations by the courts. It therefore follows that the provisions of section 73–1318, supra, granting the right of appeal in tax cases, is substantive. It also follows that the proviso regarding the time within which an appeal must be taken is procedural and under section 19–204, supra, is a rule of court. Cf. Burney v. Lee, supra.

 It would serve no useful purpose to review the authorities on the propositions that a later general rule or statute does not overrule a prior special statute or that repeals by implication are not favored. Suffice it to say that it is our considered opinion that the manifest intent of this court in adopting 21–1801, supra, was to repeal those existing rules and statutes which are inconsistent with it. Therefore the time within which an appeal may be taken in a tax proceeding is governed by section 21–1801, supra. The motion to dismiss is denied.

The basic issue involved in this appeal is whether the amounts paid by the federal government to these mining companies as subsidies for the production of over-quota copper may be included in determining the amount of the tax imposed by the Excise Revenue Act of 1935. Chap. 77, S.L.1935.

During the course of World War II the federal government found it necessary, in order to prevent hoarding, price spiraling, inflation and profiteering, to set up the Office of Price Administration whose duty it was to maintain price stability and prevent undue price rises. This agency in August of 1941 established a price ceiling of 12¢ per pound on copper. It soon became apparent that under this price schedule there would be an insufficient production of metals because many mining companies would not be able to operate at a profit and as a result our war effort would be hampered. In view of this and in order to facilitate the greatest possible production of copper and other metals, the War Production Board and the OPA announced a "premium price plan" whereby the Metals Reserve Company, a federal instrumentality (subsidiary of the Reconstruction Finance Corporation), would pay a subsidy as "a premium for production in excess of monthly quotas, * * * to compensate producers for extra costs involved in expanding the output." Quotas were then established for each producer (including the mining companies involved in these ap-

peals), and before the producer could secure the subsidy it was required to furnish the Metals Reserve Company's agent, an affidavit "showing among other things, the amount of material in excess of quota delivered during the month covered by such affidavit * * *", and a further showing that such producer was not in arrears in monthly deliveries required under his quota.

Apparently it is the contention of the Commission that the subsidy payments made to these mining companies should be considered in arriving at the amount of the tax levied under the Excise Revenue Act, *under any one of three bases*, viz: "gross proceeds of sales", or "gross income" ·or "value" of the product shipped out of the state in an unfinished condition. Specifically, however, under its one assignment of error, the Commission urges that the mining by plaintiffs of over-quota copper constituted a business activity within the meaning of the Act and that the

"business done by plaintiffs in said mining was lawfully taxed * * * by measuring the volume thereof in terms of its value, (using premium payments received therefor as a measure of a portion of said value.)"

This latter claim is in effect, as we see it, adding a fourth base not found in the Act, to-wit, application of rates against "gross receipts".

█ The position of the Company on this matter, with which we agree, is that the Commission *may not select any of these* *bases indiscriminately, but must select the* *particular single base that applies to the* *operation of the Company,* so that the Tax is determined by the application of the 1% rate against either (a) gross proceeds of sale ·or (b) gross income, or (c) value of products shipped out of the state, as the case may be. This point was settled ·by our decision in the case of Duhame v. State Tax Commission, 65 Ariz. 268, 179 P.2d 252, 257, 171 A.L.R 684, wherein we held that neither the Commission nor the taxpayer were given a choice of rates or bases for any one business.

"The statute, by clear implication, denies that for any one business there is a choice of rates or bases. Instead, reference is made to the rate that applies. * * * It is the firm belief and holding of this Court that each business is thus compelled to select the base applicable to its situation, and that the nature of the business will itself determine which base is 'suitable, fitting, relative, capable of being applied.'"

In the instant case it is conceded that the products of the plaintiff were transported out of the state in an unfinished condition for further processing, and that no part of said products were sold in the state of Arizona. Unquestionably, therefore, the portions of the Act involved, under which these assessments were levied, is as follows:

Sec. 73–1303, A.C.A.1939 "* * * there is hereby levied and shall be collected by the tax commission * * *

annual privilege taxes measured by the amount or volume of business done by the persons on account of their business activities and in the amounts to be determined by the application of rates against values, gross proceeds of sales, or gross income, as the case may be, in accordance with the following schedule:

\* \* \* \* \* \*

"(c) At an amount equal to one per cent of the gross proceeds of sales or gross income from the business upon every person engaging or continuing within this state in the following businesses: (1) Mining \* \* \*."

And the specific base applicable to the operations of these companies was the value of products shipped out of the state in an unfinished condition which is set forth under section 73–1304, A.C.A.1939, viz.:

"If any person \* \* \* shall ship or transport products, or any part thereof, out of the state without making sale of such products, or shall ship his products outside of the state in an unfinished condition, *the value of the products or articles in the condition or form in which they existed when transported out of the state and before they enter interstate commerce shall be the basis for assessment of the tax imposed* by said section, and the commission shall prescribe equitable and uniform rules for *ascertaining* such value." (Emphasis supplied.)

No rules have been promulgated for ascertaining values but it is conceded that taxes due from the plaintiffs under the Act are computed on the *basis of value as reflected by market sale price,* with certain allowable deductions therefrom. This formula is in accordance with the following pronouncement in the case of O'Neil v. Byrne, 65 Ariz. 23, 173 P.2d 633, 635, viz.:

" \* \* \* It was not until after the concentrates had left the state and had been smelted and segregated, and sold that 'the value of the products or articles in the condition or form in which they existed when transported out of the state and before they enter interstate commerce' could be ascertained and used as the basis for assessment of the tax imposed."

The crucial question then arises: Were the subsidies paid by an agency of the federal government for the production of over-quota copper a part of the market sale price of such products?

The Commission contends that such subsidies must be included in determining the amount of the tax imposed by the Act. At the outset it argues that the tax involved is not a tax on premium payments as such but rather that it is a tax on business done and that the total market sale price, which it interprets to mean ceiling price plus premium payments, merely indicates the "volume of business done". It then seeks to use this new base which we term "gross receipts" in determining the tax rather than

the base "value" of products shipped out of the state as specified in the Act.

The Commission in this case is attempting to do indirectly precisely what the New Mexico statute provides for, i. e.:

> "There is hereby levied, and shall be collected by the bureau of revenue, privilege taxes, measured by the amount or volume of business done, against the persons, on account of their business activities, engaging or continuing, within the state of New Mexico, in any business as herein defined, and in the amounts *determined by the application of rates against gross receipts,* * * *". Art. 14, § 76–1404, N.M.Sts.1941. (Emphasis supplied.)

See Albuquerque Broadcasting Company v. Bureau of Internal Revenue, 51 N.M. 332, 184 P.2d 416, 417, 11 A.L.R.2d 966.

The Commission relies heavily upon the following reported cases, viz: Combined Metals Reduction Co. v. State Tax Commission, 111 Utah 156, 176 P.2d 614; United States Smelting, Refining & Mining Co. v. Haynes, 111 Utah 172, 176 P.2d 622; Kennecott Copper Corporation v. State Tax Commission, Utah, 212 P.2d 187, and Consolidated Coppermines Corp. v. State, Nev., 231 P.2d 197. While in principle these authorities support the Commission we believe their value as precedents are weakened by differences in the taxing statutes involved. More shall be said of this later.

The plaintiffs, on the other hand, maintain that the subsidy payments made to them constituted no part of the value of the products in the condition or form in which they existed when transported out of the state. Or stated in another way, it is their position that the subsidies paid did not enhance the value of their copper nor did it form any part of the market sale price.

■ To clarify matters it might be well to define terms. In using the word "value" in the Act under consideration, the legislature doubtless intended that it should be understood according to the common and accepted usage of the word. As defined in Webster's International Dictionary, Sec-Edition, "value" is:

> "A fair return in money, goods, services, etc., for something exchanged; Monetary worth of a thing; marketable price."

The same dictionary defines "bonus" as: "a subsidy to an industry from a government", and it defines "subsidy" as follows:

> "a grant of funds or property from a government, to a private person or company to assist in the establishment or support of an enterprise deemed advantageous to the public."

Unquestionably the purpose in adopting the Premium Price Plan was to encourage the domestic production of certain scarce products. The federal law expressly prohibited payments on a cost plus basis so

there could be no guaranteed price for all production. Quotas were based on estimates of future costs and future production, and unless the quota was exceeded the producer got nothing for his pains. In each case it was necessary to develop a formula to determine the amount of the subsidy. The formula generally rewards production. It constitutes income to the producer, but as we see it, it is not a component part of the selling price of his product. This plan appears to be an artificial way of encouraging an industry or enterprise otherwise than by increasing the value of its product.

Under the Emergency Price Control Act of January 30, 1942, U.S.C.Title 50, War, Appendix, 1942 Supp., Title III, section 942, certain terms were defined:

(b) "The term 'price' means the consideration demanded or received in connection with the sale of a commodity."
(i) "The term 'maximum price', as applied to prices of commodities means the maximum lawful price for such commodities * * *."

Under the direct terms of this statute, which is controlling, there can be no theorizing that the price received from the sale of copper for the transfer of title to copper to individual consumers includes subsidies or any other consideration than "the consideration demanded or received in connection witth the sale of a commodity."

In one of the circular letters sent out to producers by the Metals Reserve Company, it was stated:

"The payment (of subsidies) *does not represent higher prices paid for the metals* but is a premium for production in excess of monthly quotas." (Emphasis supplied.)

It is an irrefutable fact that all copper was sold at the same ceiling price or open market price, irrespective of whether it was quota or over-quota copper, and irrespective of the fact that some producers had received 5¢ subsidies, some 10¢ subsidies, and many no subsidies whatsoever. It is admitted that for a part of the period involved herein there was no fixed ceiling price. Price controls on copper were lifted on November 10, 1946, but subsidies were paid until June 30, 1947.

There are but few reported cases on the primary question raised on this appeal. The following well-reasoned cases support our view that subsidy payments are not to be included in determining the amount of tax due: Kennecott Copper Corporation v. State Tax Commission, D.C., 60 F.Supp. 181, reversed on a jurisdictional point, 10 Cir., 150 F.2d 905; Id., 327 U.S. 573, 66 S.Ct. 745, 90 L.Ed. 862, and Klies v. Linnane, 117 Mont. 59, 156 P.2d 183. By analogy compare Fisher Flouring Mills Co. v. State, 35 Wash.2d 482, 213 P.2d 938, 940, holding that government subsidies on flour were not "gross proceeds derived from the sale" within the meaning of the Washington statute.

With reference to the three Utah cases previously cited as supporting the Tax Com-

mission's position in this matter, we note (with due respect to this court of a sister state) that in the main this divided court practically disregarded the controlling federal law and the administrative rules, regulations and administrative announcements promulgated thereunder. Furthermore, as we read their decision, the Utah court erroneously assumed that the subsidies involved were paid only in connection with sales instead of being "related only to production."

The construction of the Utah statutes by its highest court to the effect that it was the intent of its legislature

"to have the tax measured by one per cent of all moneys yielded by the sale, the event of the sale being the time when the measuring rod should be applied"

clearly distinguishes their statute from the Arizona statute as construed by this court in the Duhame case, supra.

As to the Nevada case of Consolidated Coppermines Corp. v. State, supra [231 P. 2d 198], it was

"recognized by all parties that the tax is an ad valorem tax rather than an income tax or occupation license * * *" to be determined by "mine proceeds".

As that court was construing the term "mine proceeds" and was not construing either "gross proceeds of sales" or the "value" of products shipped out of the state,

it is clearly distinguishable from the instant case.

■ While in the present appeals we are only concerned with interpreting the Excise Revenue Act of 1935, and determining whether under the provisions of that Act the subsidies paid for the production of over-quota copper are taxable as being a part of the market price of such products, yet it is interesting to note that the mining companies were properly required by the Commission, under the State Income Tax Law, A.C.A.1939, § 73–1501 et seq., to pay on subsidies as "income". Furthermore we understand the Commission follows the practice of considering all income received, which includes subsidies, in arriving at the ad valorem value of Arizona mines.

■■ In this jurisdiction we are firmly committed to the doctrine that doubtful tax statutes should be given a strict construction against the taxing power, giving due regard to the expression of the legislative intent; and that the courts will not "strain, stretch and struggle" to uncover hidden taxable items. See Alvord v. State Tax Commission, 69 Ariz. 287, 213 P.2d 363.

It should be remembered that the Act now in question was enacted long before the Premium Price Plan providing for subsidies was conceived. We hold that the Act, fairly interpreted, does not justify a construction that bonus or subsidy payments made by a federal agency for the purpose of increasing production of scarce metals

should be considered in determining the amount of tax due.

Judgment affirmed.

STANFORD, PHELPS, DE CONCINI, and LA PRADE, JJ., concurring.