831 P.2d 852

SALT RIVER PROJECT AGRICULTURAL IMPROVEMENT AND POWER DISTRICT, a political subdivision of the State of Arizona; the Atchison, Topeka and Santa Fe Railway Company, a Delaware corporation; Tucson Electric Power Company, an Arizona corporation; San Carlos Resources, Inc., an Arizona corporation; Valencia Energy Company, an Arizona corporation; Mountain States Telephone and Telegraph Company, a Colorado corporation, doing business as U.S. West Communications; Arizona Public Service Company, an Arizona corporation; Public Service Company of New Mexico, a New Mexico corporation, Plaintiffs–Appellants,

v.

APACHE COUNTY, a political subdivision of the State of Arizona; Arizona Department of Revenue, an agency of the State of Arizona, Defendants–Appellees.

No. 1 CA–TX 91–002.

Court of Appeals of Arizona, Division 1, Department T.

March 26, 1992.

Review Granted June 30, 1992.

Jennings, Strouss & Salmon by Ann M. Dumenil, Phoenix, for plaintiff-appellant Salt River Project Agr. Imp. and Power Dist.

Fennemore Craig, P.C. by Timothy Berg, Paul J. Mooney, Phoenix, for plaintiffs-appellants Atchison, Topeka & Santa Fe Ry. Co., Tucson Elec. Power Co., Mountain States Tel. & Tel. Co., San Carlos Resources, Inc. and Valencia Energy Co.

Snell & Wilmer by Lawrence F. Winthrop, Eileen J. Moore, Phoenix, for plaintiffs-appellants Ariz. Public Service Co. and Public Service Co. of N.M.

Mohr, Hackett, Pederson, Blakley, Randolph & Haga, P.C. by David L. Haga, Robert E. Jacobson, Azim Q. Hameed, Phoenix, for defendant-appellee Apache County.

Grant Woods, Atty. Gen. by Patrick Irvine, Asst. Atty. Gen., Phoenix, for defendant-appellee Ariz. Dept. of Revenue.

## OPINION

CONTRERAS, Presiding Judge.

The owners of taxable real property in Apache County appeal from a summary judgment entered by the Arizona Tax Court in the county's favor. In entering summary judgment, the Arizona Tax Court determined that the county had correctly calculated its levy limit for the 1986 tax year pursuant to article IX, section 19 of the Arizona Constitution and A.R.S. section 42–301. The Arizona Tax Court based its determination upon the interpretation that Division Two of this court had given these constitutional and statutory provisions in *Arizona Tax Research Ass'n v. Maricopa County*, 162 Ariz. 94, 781 P.2d 71 (App. 1989), *vacated in part on other grounds*, 163 Ariz. 255, 787 P.2d 1051 (1989). We reverse because we conclude that *Arizona Tax Research* interpreted the provisions incorrectly.

## FACTUAL AND PROCEDURAL BACKGROUND

At a special election held on June 3, 1980, the voters of Arizona approved and adopted article IX, section 19 of the Arizona Constitution. Section 19 provides in part:

(1) The maximum amount of ad valorem taxes levied by any county, city, town or community college district shall not exceed an amount two percent greater than the amount levied in the preceding year.

. . . .

(4) The limitation prescribed by subsection (1) shall be increased each year to the maximum permissible limit, whether

or not the political subdivision actually levies ad valorem taxes to such amounts.

(5) The voters, in the manner prescribed by law, may elect to allow ad valorem taxation in excess of the limitation prescribed by this section.

(6) The limitation prescribed by subsection (1) of this section shall be increased by the amount of ad valorem taxes levied against property not subject to taxation in the prior year and shall be decreased by the amount of ad valorem taxes levied against property subject to taxation in the prior year and not subject to taxation in the current year. Such amounts of ad valorem taxes shall be computed using the rate applied to property not subject to this subsection.

(7) The Legislature shall provide by law for the implementation of this section.

Pursuant to article IX, section 19(7), the legislature enacted A.R.S. section 42–301(A), which provides:

In addition to any other limitations that may be imposed, the counties, cities, including charter cities, towns and community college districts shall not levy primary property taxes in any year in excess of an aggregate amount computed as follows:

(1) Determine the maximum allowable primary property tax levy limit for such jurisdiction for the prior tax year.

(2) Multiply paragraph 1 by 1.02.

(3) Determine the assessed value for the current tax year of all property in such entity that was subject to tax in the preceding tax year.

(4) Divide the dollar amount determined in paragraph 3 by one hundred and then divide the dollar amount determined in paragraph 2 by the resulting quotient. The result rounded to four decimal places is the maximum allowable tax rate for the jurisdiction.

(5) Determine the finally equalized valuation of all property, less exemptions, appearing on the tax roll for the current tax year including an estimate of the unsecured property tax roll determined pursuant to § 42–304.01.

(6) Divide the dollar amount determined in paragraph 5 by one hundred and then multiply the resulting quotient by the rate determined in paragraph 4. The resulting product is the maximum allowable primary property tax levy limit for the current fiscal year for all political subdivisions.

(7) The allowable levy of primary property taxes for the current fiscal year for all political subdivisions is the maximum allowable primary property tax levy limit less any amounts required to reduce the levy pursuant to subsections I and J of this section.

The levy limit formula of section 42–301(A) establishes the following arithmetical relationship: the levy limit for the current year equals 1.02 multiplied by the product of the levy limit for the immediately preceding year times a fraction whose numerator is the total current assessed valuation of all property subject to taxation in the current year and whose denominator is the total current assessed valuation of all property that was subject to taxation in the immediately preceding year.

During the tax years affected by this appeal, Arizona law required the Department of Revenue to value utility property according to rules that are currently set forth in A.R.S. section 42–144.02. *See* former A.R.S. § 42–144. The rules provide that an operating electric plant is to be valued at its "original plant in service cost" less depreciation. A.R.S. § 42–144.02(B)(2).[1] Electric utility property that is not yet used or useful for generating electric power, however, is to be valued at "fifty per cent of the amount expended and

---

**1.** Arizona Revised Statutes section 42–144.02(H)(6) defines "plant" as "all property situated in this state used or useful for the generation, transmission or distribution of electric power or distribution of natural *gas*, but does not include land rights, materials and supplies and licensed vehicles." Arizona Revised Statutes section 42–144.02(H)(5) defines "original plant in service cost" as "the actual cost of acquisition or construction of property including additions, retirements, adjustments and transfers, but without deduction of related accumulated provision for depreciation, amortization or other purposes."

entered upon the accounting records of the taxpayer as of December 31 of the preceding calendar year as construction work in progress." A.R.S. § 42–144.02(C).[2]

The controversy in the present case arose out of the doubling of the statutory valuation of Unit I of the Springerville Generating Station for the 1986 tax year as a result of the unit's having been placed into service in 1985. Although the unit was substantially completed before January 1, 1985, it was not in commercial service and generating power before that date. As a result, it was valued as construction work in progress (CWIP) for the 1985 tax year. Between January 1 and May 31 of 1985, the unit was in its "start-up" phase awaiting certification. It went into commercial service and began generating electric power on June 1, 1985. In accordance with section 42–144.02(B)(2) and (C), the Arizona Department of Revenue first valued the unit at its operating plant in service (OPIS) cost in the 1986 tax year.

Apache County used the procedure set forth in section 42–301 to calculate its primary property tax levy limit for 1986. It initially determined the maximum allowable tax rate for the year pursuant to subsections 3 and 4 of section 42–301(A). These subsections fixed the denominator of the fraction that was to yield the maximum tax rate at one hundredth of "the assessed value for the current tax year [1986] of all property in [Apache County] that was subject to tax in the preceding tax year [1985]." The county did not include Unit I's OPIS value in the total assessed value figure. It instead treated the doubling in valuation that occurred when the unit first went into service as the creation of property that had not been subject to taxation in the preceding tax year. *See* § 42–144.-02(B)(2) and (C). It therefore only included the unit's CWIP value—that is, fifty percent of its construction cost as of December 31, 1984–in the total assessed value figure. *See* A.R.S. § 42–144.02(C). This

amount was $81,085,360 less than Unit I's 1986 OPIS value.

The total assessed value figure was the denominator of the fraction that was to yield the "maximum allowable tax rate" pursuant to section 42–301(A)(3) and (4). Since excluding the OPIS value from the assessed value figure made the denominator of this fraction smaller, it resulted in a higher tax rate than would have been the case if the OPIS value had been included. Employing the higher tax rate in the remaining calculations specified by section 42–301(A)(5) and (6) yielded a 1986 levy limit of $619,345. If the OPIS value of Unit I had been used in calculating the maximum tax rate, the levy limit would have been $491,042, or $128,303 less. Because each year's levy limit is based in part upon the previous year's limit, the use of Unit I's CWIP value instead of its OPIS value in computing the 1986 limit not only increased the limit for that year, but for each of the succeeding years as well.

In 1986, appellants filed four separate actions in the Apache County Superior Court challenging the legality of the county's treatment of Unit I. These actions were consolidated and transferred to Greenlee County. In 1987, the taxpayers filed separate actions in the Arizona Tax Court challenging the county's calculation of the 1987 property tax rate and levy limit, in part on the theory that the calculations were based upon the improperly computed 1986 levy limit. These actions were also consolidated. The 1986 levy limit actions were then transferred from the Greenlee County Superior Court to the Arizona Tax Court and consolidated with the 1987 actions. Appellants filed actions challenging the county's tax rates and levy limits for the 1988 and 1989 tax years, and these were consolidated with the earlier actions.

The parties filed cross motions for summary judgment on all of the consolidated claims, and the Arizona Tax Court granted summary judgment in favor of Apache

---

**2.** "Construction work in progress" is defined as "the total of the balances of work orders for an electric, gas distribution or combination electric and gas distribution plant in process of con-

struction on the last day of the preceding calendar year exclusive of land rights and licensed vehicles." A.R.S. § 42–144.02(H)(1).

County and the Department of Revenue. In doing so, it followed *Arizona Tax Research Association v. Maricopa County*, 162 Ariz. 94, 781 P.2d 71 (App.1989), *vacated in part on other grounds*, 163 Ariz. 255, 787 P.2d 1051 (1989). In that decision, Division Two concluded that when utility property which has been under construction is placed into service, the difference between its CWIP value and its OPIS value constitutes property that was not subject to taxation in the previous year. The Arizona Tax Court accordingly agreed with Apache County that only Unit I's CWIP value should have been included in the denominator of the formula by which the maximum allowable tax rate for 1986 was computed. Appellants timely filed a joint notice of appeal.

## PRECLUSION OF CWIP ISSUE PURSUANT TO DOCTRINE OF COLLATERAL ESTOPPEL OR VIRTUAL REPRESENTATION

In *Arizona Tax Research*, Division Two resolved the legal issue presented by this appeal against the position that appellants now advocate. It held that a county's primary property tax levy limit was to be computed using the CWIP value of the property in question rather than its OPIS value. Citing the doctrines of collateral estoppel and virtual representation, Apache County contends as a cross-issue that the Arizona Tax Court's judgment must be affirmed because appellants were precluded from relitigating the CWIP issue.

■ We lack jurisdiction to consider Apache County's preclusion argument. In *Bowman v. Board of Regents*, 162 Ariz. 551, 785 P.2d 71 (App.1989), we stated:

In the absence of a cross-appeal, an appellee may raise a cross-issue in its answering brief only when it meets these criteria:

(1) The cross-issue must be an argument in support of the judgment, not merely in support of the ultimate disposition on grounds that would attack the judgment;

(2) The cross-issue must have been presented and considered by the trial court in rendering the judgment, whether or not the trial court ultimately rejected or simply ignored the issue in any disposition; and

(3) The cross-issue must not result in an enlargement of appellee's rights or a lessening of appellant's rights on appeal.

Issues that do not meet this test, assuming they are otherwise appealable, must be the subject of a timely notice of cross-appeal.

*Id.* at 559, 785 P.2d at 79. *Accord E.C. Garcia & Co. v. Arizona Dep't of Revenue* (App.1991); *California Cotton Coop. Ass'n v. Arizona Dep't of Revenue*, 169 Ariz. 261, 818 P.2d 246 (App.1991); *Hibbs v. Chandler Ginning Co.*, 164 Ariz. 11, 790 P.2d 297 (App.1990).

■ The doctrine of collateral estoppel precludes a party from relitigating an issue identical to one that he has previously litigated to a determination on its merits in another action. *Aldabbagh v. Arizona Dep't of Liquor Licenses & Control*, 162 Ariz. 415, 783 P.2d 1207 (App.1989). Two of the losing taxpayers in *Arizona Tax Research* are appellants in the present case. Apache County argued in the Arizona Tax Court that those taxpayers were collaterally estopped from relitigating the CWIP issue.

■ The doctrine of virtual representation precludes a taxpayer who has filed an action against a governmental subdivision from relitigating an issue of public interest that a similarly situated taxpayer has litigated to a determination on the merits in another action against a governmental subdivision. *El Paso Natural Gas Co. v. State*, 123 Ariz. 219, 599 P.2d 175 (1979), *cert. denied*, 445 U.S. 938, 100 S.Ct. 1331, 63 L.Ed.2d 772 (1980). In the Arizona Tax Court, the county argued that this doctrine prevented the taxpayers in the present action who were not parties in *Arizona Tax Research* from relitigating the CWIP issue which similarly situated taxpayers had litigated in that case. The Arizona Tax Court ruled in the county's favor on the merits and did not reach the preclusion arguments.

As an alternative ground to support the result in its favor, Apache County argues on appeal that the Arizona Tax Court did not need to reach the merits because appellants' claims were precluded. In *Bowman,* we indicated that when an appellee who has prevailed on the merits in the trial court argues as an alternative ground for affirmance on appeal that the trial court did not need to reach the merits, he is actually arguing in support of the result that the trial court reached but attacking the judgment that the court entered. 162 Ariz. at 558, 785 P.2d at 78. We held that the appellee must file a cross-appeal to raise such an argument.

Apache County's preclusion argument fails to qualify as a cross-issue for another reason that we discussed in *Bowman.* If the county prevailed on this argument, appellants' rights on appeal would be lessened because they would be deprived of a resolution of their claim on the merits. We therefore conclude that the county was required to file a timely cross-appeal from the tax court's judgment to present its preclusion argument. Because it failed to do so, we do not consider that argument. We now turn to the merits.

CALCULATION OF APACHE COUNTY'S 1986 PRIMARY PROPERTY TAX LEVY LIMIT

*The Parties' Contentions*

Appellants urge us not to follow Division Two's opinion in *Arizona Tax Research.* They argue that it misinterprets article IX, section 19 of the Arizona Constitution and A.R.S. section 42–301 and allows taxing entities to establish property tax levy limits at illegally high levels. They observe that under section 42–301(A)(3), the calculation of the maximum allowable tax rate is based upon "the assessed value for the current tax year of all property in [the] entity that was subject to tax in the preceding tax year." They contend that the doubling of Unit I's valuation when it was placed into service in 1986 did not evidence the creation of new "property" that was not subject to tax in the previous year. They maintain that one hundred percent of Unit I was "property ... that was subject to

tax" in 1985 and that its entire assessed value for the 1986 tax year should therefore have been included in the denominator of the maximum tax rate formula established by section 42–301(A)(3) and (4).

Appellants also cite article IX, section 2(6) of the Arizona Constitution, which provides as follows:

All property in the State not exempt under the laws of the United States or under this Constitution or exempt by law under the provisions of this section shall be subject to taxation to be ascertained as provided by law.

They argue that the county's interpretation of section 42–301(A)(3) is inconsistent with article IX, section 2(6) because it fails to recognize that since all of the property comprising Unit I was in existence in 1985 and none of it was exempt from taxation in that year, it must all have been subject to tax in accordance with section 2(6).

Apache County bases its contrary analysis upon the premise that Unit I was "CWIP property" in 1985 and "OPIS property" in 1986. It maintains that the only "property" that existed and "was subject to tax" within the meaning of section 42–301(A)(3) in 1985 was "CWIP property." It contends that because this property was valued at fifty percent of its construction cost, only that value could properly have been included in the maximum tax rate calculation. It asserts that Unit I simply did not exist as "OPIS property" in 1985 and that the 1986 OPIS value of Unit I should therefore have been entirely excluded from the calculation.

The county further argues that the difference between the OPIS and CWIP values of Unit I in effect represents "new construction" that was not subject to tax in 1985. It maintains that this "new construction" is never added to the county's tax base under appellants' interpretation of section 42–301.

*Division Two's Opinion in Arizona Tax Research*

*Arizona Tax Research* concerned the calculation of Maricopa County's 1987 primary property tax levy limit. Units I and

II of the Palo Verde Nuclear Generating Station had been completed after January 1, 1986, but before January 1, 1987. Pursuant to former A.R.S. section 42–144(C)(1) and (E), the units were accordingly valued as CWIP at fifty percent of construction cost for the 1986 tax year and as OPIS at one hundred percent of construction cost for the 1987 tax year. As in the instant case, the question in *Arizona Tax Research* was whether the county's primary property tax levy limit was to be computed using the properties' OPIS values, as the taxpayers argued, or their CWIP values, as Maricopa County argued.

The superior court ruled for the taxpayers, but Division Two of this court reversed, reasoning as follows:

A utility plant under construction is useless until it is placed into service and able to produce both electricity and revenue. That the legislature recognized this is evident from the distinction created in A.R.S. § 42–144 between "CWIP" and "OPIS" and by the lesser valuation accorded "CWIP". Once the plant is placed in service its character changes both practically and statutorily. Our reading of art. IX, § 19 and the relevant statutes leads us to conclude that when utility property which has been under construction is placed into service there is new property not subject to taxation in the prior year equal to the difference between the "CWIP" value and the "OPIS" value.

The constitutional provision was designed to place a general limitation on the growth of governmental spending to 2% a year. Recognizing, however, the enormous growth of the state, the provision went on to exempt new construction. If we were to accept cross-appellees' argument, the reduced valuation during construction would permanently reduce the county's ability to fund its activities because fifty percent of the construction cost of the Palo Verde plant would never be treated as new construction so as to increase the tax base from which Maricopa County may compute its levy limitation. While it is possible to say that Palo Verde was subject to tax in 1986 but at a reduced rate and that the value in 1987 of that property for purposes of A.R.S. § 42–301(A)(3) was double because the rate reduction had expired, a literal interpretation adopted by the Attorney General, Atty.Gen.Op. No. I87–029 (Feb. 12, 1987), that construction would defeat the constitutional policy of allowing the levy limitation to grow by net new construction. Statutes should not be so construed. *See Perez v. Maricopa County*, 158 Ariz. 40, 760 P.2d 1089 (App.1988). In granting reduced taxes during construction of a utility, it was surely not the legislative intent permanently to reduce county funding. The judgment of the trial court is reversed.

162 Ariz. at 96, 781 P.2d at 73.

The result that Division Two reached in *Arizona Tax Research* is understandable and perhaps desirable as a matter of legislative policy. However, for the reasons that we discuss below, we must respectfully differ with Division Two's analysis and its legal conclusion.

### Stare Decisis

Before proceeding to our constitutional and statutory interpretation, we address the dissent's assertion that we should defer to Division Two's analysis and its disposition in *Arizona Tax Research* in accordance with the doctrine of *stare decisis*. We fully acknowledge that this doctrine furthers the important values of uniformity, certainty, and stability in our legal system. *State v. Cox*, 43 Ariz. 174, 30 P.2d 825 (1934). However, other equally important values are at stake, and they must also be acknowledged. Our supreme court has recognized that "it is perhaps of the greater importance, as to far-reaching principles, that the court should be right rather than merely in harmony with previous decisions" and that "the doctrine of *stare decisis* should not prevail when a departure therefrom is necessary to avoid the perpetuation of pernicious error." *Id.* at 183, 30 P.2d at 828–29. We sincerely believe that such a departure is necessary in this case.

In our judgment, Division Two failed to fully consider a number of settled princi-

ples of constitutional and statutory interpretation when it analyzed article IX, section 19 of the Arizona Constitution and its implementing statute, section 42–301. We believe that Division Two's erroneous construction of these provisions will have the continuing effect of allowing property taxes to rise above the yearly limit which the Arizona electorate established by adopting article IX, section 19. While the passage of time has given rise to additional applications of the rule that *Arizona Tax Research* formulated, it has done nothing to make that rule any more correct than it was when it was first announced. We are therefore convinced that in this matter of public importance, we would do more harm by following *Arizona Tax Research* than we would by departing from it. *See State v. Pena,* 140 Ariz. 545, 683 P.2d 744 (App. 1983)(court will decline to follow prior decision to avoid perpetuation of error); *Castillo v. Industrial Comm'n,* 21 Ariz.App. 465, 520 P.2d 1142 (1974)(prior decisions are highly persuasive and binding unless based upon clearly erroneous principles). Accordingly, the fully acknowledged doctrine of *stare decisis* must, in the opinion of the majority, take a secondary stance in order to "avoid the perpetuation of pernicious error."

In addition to its stated position on *stare decisis,* the dissent believes that deference should be given to Division Two's resolution of this controversy because it was "reasonable and fair." The majority believes that although Division Two's resolution of the subject controversy has the outward appearance of being "reasonable and fair", the resolution is not sound because of its failure to fully consider a number of settled principles of constitutional and statutory interpretation. We now proceed to that discussion and analysis.

*Interpretation Of Article IX, Section 19 of the Arizona Constitution and A.R.S. Section 42–301*

■ As we have stated, Division Two, in our opinion, overlooked a number of settled principles of constitutional and statutory interpretation in analyzing article IX, section 19 of the Arizona Constitution and

its implementing statute, section 42–301. Constitutional provisions are to be interpreted in light of the history behind their enactment, the purpose sought to be accomplished by their enactment, and the evil that their enactment seeks to remedy. *Ruth v. Industrial Comm'n,* 107 Ariz. 572, 490 P.2d 828 (1971). When a constitutional provision is clear, judicial construction is neither required nor proper. *Pinetop–Lakeside Sanitary Dist. v. Ferguson,* 129 Ariz. 300, 630 P.2d 1032 (1981).

■ Similarly, the best and most reliable index of a statute's significance is its language, which carries its usual meaning unless otherwise required by the context of the statute and the entire act of which it is a part. *Pima County Juvenile Appeal No. 74802-2,* 164 Ariz. 25, 790 P.2d 723 (1990); *State Compensation Fund v. Nelson,* 153 Ariz. 450, 737 P.2d 1088 (1987). Our supreme court has stated:

> The most basic rule of statutory construction is that in construing the legislative language, courts will not enlarge the meaning of simple English words in order to make them conform to their own peculiar sociological and economic views. *Kilpatrick v. Superior Court,* 105 Ariz. 413, 466 P.2d 18 (1970). And this is true even though the interpretation which the court renders is harsh and uncompassionate.

*Padilla v. Industrial Comm'n,* 113 Ariz. 104, 106, 546 P.2d 1135, 1137 (1976). *Accord Parker v. Walgreen Drug Co.,* 63 Ariz. 374, 162 P.2d 427 (1945) (court will follow plain and unambiguous meaning even though result may be harsh, unjust, or a mistaken policy); *Perkins v. Hughes,* 53 Ariz. 523, 91 P.2d 261 (1939) (court may not attribute different meaning to unambiguous, clear, and definite statutory language merely because result reached is unusual or peculiar).

It is also our opinion that Division Two's decision overlooked the general rule that revenue enactments are to be construed liberally in favor of the taxpayer and strictly against the taxing authority. *State Tax Comm'n v. Miami Copper Co.,* 74 Ariz.

234, 246 P.2d 871 (1952); *State Tax Comm'n v. Ranchers Exploration & Dev. Corp.*, 22 Ariz.App. 480, 528 P.2d 866 (1974). As the supreme court stated in *Miami Copper Co.:*

> In this jurisdiction we are firmly committed to the doctrine that doubtful tax statutes should be given a strict construction against the taxing power, giving due regard to the expression of the legislative intent; and that the courts will not "strain, stretch and struggle" to uncover hidden taxable items.

74 Ariz. at 243, 246 P.2d at 877.

In our opinion, both the plain language and the underlying policy of article IX, section 19 of the Arizona Constitution and A.R.S. section 42–301 compel a decision in favor of appellants in this case. As we have noted, article IX, section 19 was adopted at a special election on June 3, 1980. In approving this provision, the Arizona electorate established the core principle that the maximum amount of ad valorem taxes levied by a county, city, town, or community college district must not exceed an amount two percent greater than the amount levied in the immediately preceding year.

At the same time, the electorate also adopted a number of specific exceptions to the principle. It expressly made the two percent growth limitation inapplicable to ad valorem taxes or assessments levied to pay bonded indebtedness, to those levied by or for property improvement assessment districts, and to those levied by counties for the support of common, high, and unified school districts. Ariz. Const. art. IX, § 19(2). The electorate also empowered itself to exceed the levy limitation imposed by section 19(1) through the ballot box. Ariz. Const. art. IX, § 19(5). In addition to the exemptions, the electorate adopted the following qualification:

> The limitation prescribed by subsection (1) of this section shall be increased by the amount of ad valorem taxes levied against property not subject to taxation in the prior year and shall be decreased by the amount of ad valorem taxes levied against property subject to taxation in the prior year and not subject to taxation in the current year. Such amounts of ad valorem taxes shall be computed using the rate applied to property not subject to this subsection.

Ariz. Const. art. IX, § 19(6).

This subsection of article IX, section 19, and its implementing statute, A.R.S. section 42–301(A), gave rise to the legal controversy addressed by Division Two in *Arizona Tax Research* and presented to us in the instant case. Division Two deemphasized the subsection's specific language and extrapolated from it an overarching policy that ad valorem taxes on "net new construction" were to fall outside the subsection's two percent levy limit. It concluded that the taxpayers' proposed interpretation of the levy limit formula would cause half of the construction cost of Palo Verde "never [to] be treated as new construction so as to increase the tax base from which Maricopa County may compute its levy limitation." 162 Ariz. at 96, 781 P.2d at 73. Based in part upon this conclusion, it found that "when utility property which has been under construction is placed into service there is new property not subject to taxation in the prior year equal to the difference between the 'CWIP' value and the 'OPIS' value." *Id.*

We disagree. The utility properties in *Arizona Tax Research* and in the instant case were not only in existence and substantially complete in the years preceding the tax years in question, they were subject to taxation at their CWIP values in the preceding years. In neither case was any *new property* actually brought into existence during the tax years at issue. The only change that occurred in those years was that each utility plant was placed into service and its statutory valuation increased as a result. Contrary to Apache County's argument in the instant case, this change did not transform the plants from one kind of property ("CWIP property") into an entirely different kind of property ("OPIS property"). CWIP and OPIS are not statutory designations for different kinds of property. They are different statutory methods for valuing the *same prop-*

*erty* based on its use or usefulness in generating power. A.R.S. § 42–144.02(B), (C), (D), and (H)(1), (5), and (6).

■ In *Arizona Tax Research,* Division Two focused primarily upon the legislature's intent in adopting the CWIP and OPIS methods of valuing utility property. In our opinion, this focus was too narrow. The key to determining the correct method of calculating the constitutional levy limitation is *not the legislature's intent* in enacting A.R.S. section 42–144.02, *but the Arizona electorate's intent* in adopting article IX, section 19 of the Arizona Constitution.

■ We believe that the dispositive question is whether, in adopting article IX, section 19, the people of Arizona intended to permit property taxes to rise regardless of the levy limitation when statutory valuations of property increased due to changes in use or usefulness from one year to the next. In our opinion, they clearly did not. In adopting article IX, section 19, the voters approved a limited number of closely-drawn exceptions to the general rule that a taxing entity's maximum levy limit was to be restricted to two percent growth in any one year. Among these exceptions was section 19(6), which provided that the levy limit was to be decreased by the amount of ad valorem taxes levied the year before against property no longer subject to taxation in the current year and that the levy limit was to be increased "by the amount of ad valorem taxes levied against property not subject to taxation in the prior year."

■ The ordinary meaning of this clear language militates against Division Two's approach of equating property that was on the tax rolls in the prior year but was subject to an increase in valuation in the current year with "new" property that was not subject to taxation at all in the prior year. In our opinion, section 19(6) stands only for the singular and uncontroversial proposition that in calculating each year's levy limit, allowances must be made for property that is added to or deleted from the tax rolls. We believe that the interpretation that Division Two and Apache County place upon both section 19(6) and A.R.S. section 42–301(A)(3) goes far beyond the

ordinary meaning conveyed by the plain and unambiguous language of these constitutional and statutory provisions.

The text of proposed article IX, section 19 was offered to the voters of Arizona as Proposition 107 at a special election held on June 3, 1980. The publicity pamphlet which the Arizona Secretary of State distributed before that election dispels any lingering doubt about the electorate's intent in adopting section 19(6). The Arizona courts have repeatedly referred to the content of such pamphlets in interpreting provisions of the Arizona Constitution that have been adopted by the voters. *See, e.g., McElhaney Cattle Co. v. Smith,* 132 Ariz. 286, 645 P.2d 801 (1982); *Apache County v. Southwest Lumber Mills, Inc.,* 92 Ariz. 323, 376 P.2d 854 (1962). Our supreme court has stated:

> When constitutional questions have arisen, the court has availed itself of pertinent records of the Constitutional Convention for an insight into the effect intended from the provision in question. *Bohannan v. Corporation Commission,* 82 Ariz. 299, 313 P.2d 379 [1957]. This approach, we believe, is equally applicable when, as here, the subject matter is a constitutional amendment proposed by the legislature and referred to a vote of all of the qualified voters of the state at a general election. Article XXI of the Constitution of Arizona provides that in such cases the voters are to be apprised of the purpose and intended effect of the change by means of a publicity pamphlet which the Secretary of State is required by law to prepare and distribute prior to the election. *See* A.R.S. § 19–123. We take judicial notice of the official records of the Secretary of State. *Bolin v. Superior Court,* 85 Ariz. 131, 333 P.2d 295 [1958]. Although this background material is not necessarily controlling in all cases, it is entitled to some weight.

*Ward v. Stevens,* 86 Ariz. 222, 229, 344 P.2d 491, 495 (1959).

The publicity pamphlet distributed pursuant to A.R.S. section 19–124(B) before the June 3, 1980, election contained the follow-

ing analysis of Proposition 107 by the legislative council:

Proposition 107 would amend the Constitution of Arizona by adding section 19 to article IX to impose a limit on the annual increase in county, city, town and community college district property tax levies. The amount of tax could not be increased more than 2% over that levied in the previous year.

The 2% limitation would not apply to taxes levied:

(1) To pay bonded indebtedness or other long-term obligations incurred for specific purposes.

(2) By or for improvement, assessment or special purpose districts.

(3) Levies by counties for support of school districts.

The 2% increase figure would be incorporated into the computation for allowable property taxes for subsequent years regardless of whether the political subdivision actually levied the taxes to such an extent. Therefore, the political subdivision would not be penalized or its levy capacity reduced in subsequent years.

The voters of the political subdivision could authorize tax levies in excess of the 2% limit as otherwise prescribed by law.

The 2% limitation would be adjusted each year for each political subdivision to account for *property which is added to or removed from the tax roll* in each political subdivision.

The new constitutional text would apply to all tax years beginning after December 31, 1981 and the Legislature would be required to provide by law for implementation.

(Emphasis added.)

The publicity pamphlet also incorporated the following arguments in favor of the proposition:

Today's rampant inflation is due in large part to excessive spending by all levels of government. Property taxes imposed by local governments constitute a significant burden on many taxpayers who must live within very tight budgets. It is only fair that local governments be required to live under the same types of budget restrictions as households and businesses. By prescribing limitations on property tax increases, this proposition would provide a balanced and effective restraint on the excessive demands of local governments to spend tax revenues.

Both governments and taxpayers will be able to plan their budgets more efficiently since future property tax levies will be much more predictable.

Proposition 107 will not hamstring local governments. Its restraints are tempered by flexibility. *This proposition allows for adjustments to the limitation for property added to or deleted from the tax rolls.* Further, this proposition recognizes that conditions are not identical in the counties, cities, towns and community college districts of this state and allows residents of a particular governmental entity to exceed the 2% limitation through an override election.

The reasonable limitations imposed by Proposition 107 will help to ensure that governmental revenues are spent in a wise and efficient manner.

(Emphasis added.)

These excerpts explicitly informed the voters that the subsection (6) qualification to the general two percent levy limitation only authorized increases in the limitation to adjust for property that was "added to ... the tax roll"—that is, property that was not on the tax roll at all in the prior year. As is true with the language of section 19(6) itself, the publicity pamphlet contained nothing which indicated that the qualification also authorized increases in the levy limitation to adjust for increases in the valuation of property that was already on the tax roll.

Division Two's analysis in *Arizona Tax Research* has a logical appeal that appears to emanate from the unique nature of the property involved and the huge increase in statutory valuation that accompanied the property's change in use from one year to the next. The decision seems to adopt the unspoken principle that the valuation increase was so large that, as a matter of

"fairness" to the taxing authority, it had to be deemed "new property" which was not subject to taxation in the prior year. In truth, however, there is no principled means of distinguishing between large and small valuation increases as a result of changes in use. Nothing in the rationale of *Arizona Tax Research* explains why an increase in the value of a parcel of class 4 property upon its conversion from agricultural to nonagricultural use from one year to the next would not also fall outside the levy limit. *See* A.R.S. §§ 42–141(A)(5), 42–162(A)(4). However, it is intuitively clear that this result was not intended by the people of Arizona when they adopted section 19(6).

Apache County implies that under appellants' interpretation, the amount by which a utility plant's value increases when it is placed into service will be forever lost from the tax base. This is not correct. It is true that the county's levy limit will not increase by the full amount of taxes at the prior year's rate that would have been owed on the difference between the plant's OPIS and CWIP valuations, but it is also true that the entire property is fully subject to taxation in the current year at its OPIS value.

We also observe that the Arizona Attorney General has interpreted article IX, section 19(6) of the Arizona Constitution and A.R.S. section 42–301(A)(3) in the same way as we have in this case. Op.Atty.Gen. No. I87–029 (February 12, 1987). We agree with the analysis contained in that opinion.

Because we reverse and remand for further proceedings, we deny Apache County's request for attorney's fees pursuant to A.R.S. sections 12–341.01(C) and 12–349.

We reverse the decision of the Arizona Tax Court and remand for proceedings consistent with this opinion.

EUBANK, J., concurs.

FIDEL, Judge, dissenting:

I respectfully dissent. The taxing authorities of this state have had reason to assume since 1989 that the major fiscal issues of this case were fully and finally resolved by *Arizona Tax Research Ass'n v. Maricopa County*, 162 Ariz. 94, 781 P.2d 71 (App.1989), *vacated in part on other grounds*, 163 Ariz. 255, 787 P.2d 1051 (1989). This case should be governed by stare decisis. Our court should defer to settled law.

I take this position for three reasons. First, the identical arguments presented in this case were made in *Arizona Tax Research* by many of the identical lawyers who make them here. The Salt River Project and Arizona Public Service Company, parties here, were parties there as well. This lawsuit is a practical replay of the lawsuit finally concluded there. Appellees cite these facts as compelling grounds for issue preclusion. *See El Paso Natural Gas Co. v. State*, 123 Ariz. 219, 599 P.2d 175 (1979), *cert. denied*, 445 U.S. 938, 100 S.Ct. 1331, 63 L.Ed.2d 772 (1980). Unfortunately, as the majority points out, this argument for issue preclusion was not preserved. Appellees, caught in a quagmire of our current appellate procedural law, attempted by cross-issue what must be done by cross-appeal.[3] Yet, though we reach the merits, the very considerations pertinent to issue preclusion strengthen the case for deference to stare decisis. This controversy has been once resolved.

---

**3.** In a pending petition before our supreme court, the State Bar of Arizona seeks to simplify existing law by adding the following to the Arizona Rules of Civil Appellate Procedure:

> 13(b)(3) The brief of the appellee may, without need for a cross-appeal include in the statement of issues presented for review and in the argument any issue properly presented in the superior court. The appellate court may affirm the judgment based on any such grounds.
>
> The appellate court may direct that the judgment be modified to enlarge the rights of the

appellee or to lessen the rights of the appellant only if the appellee has cross-appealed seeking such relief.

In support of its proposal, the Bar describes the categories and distinctions of our present law of cross-appeals as "a trap for the unwary" and as "obscure and difficult to apply even if one is aware of them." Petition for Adoption of Rules 13(b)(2) and (3) of the Arizona Rules of Civil Appellate Procedure, Supreme Court No. R–91–0050 (filed Dec. 20, 1991). This case demonstrates the accuracy of the Bar's description and the virtue of its proposal.

My second reason for deference is that the first resolution of this controversy was reasonable and fair. Our tax code contemplates two categories of property pertinent to this case. One is inchoate—construction work in progress—brick and mortar rising into form. Ariz.Rev.Stat.Ann. ("A.R.S.") § 42–144(C)(1) and (E) (current version at A.R.S. § 42–144.02(C) and (H)(1)). The second is choate, complete, accomplished—an operating plant in service. A.R.S. § 42–144(C)(5) (current version at A.R.S. § 42–144.02(H)(5)). Both are unquestionably property subject to taxation. The question here, as in *Arizona Tax Research*, is whether for constitutional purposes they are the same.

Article IX, section 19, of the Arizona Constitution refers to "property subject to taxation in the prior year." Our two courts interpret this phrase differently because they place their focus differently. The majority focuses on the elements of a power plant—its brick and mortar and raw land—and concludes that the property composing the new plant was subject to taxation as work in progress in the prior year. In *Arizona Tax Research*, by contrast, the court emphasizes the qualitative difference between *work* in progress and a new *plant* in service, finding the latter to be property of a wholly different character than was subject to taxation in the prior construction year:

> A utility plant under construction is useless until it is placed into service and able to produce both electricity and revenue. That the legislature recognized this is evident from the distinction created in A.R.S. § 42–144 between "CWIP" and "OPIS" and by the lesser valuation accorded "CWIP". *Once the plant is placed in service its character changes both practically and statutorily.*

*Arizona Tax Research*, 162 Ariz. at 96, 781 P.2d at 73 (emphasis added).

The majority feels bound to reject *Arizona Tax Research* by "the plain language ... of the Arizona Constitution." I do not find that language so plain in application to the question of this case. The Constitution speaks of "property subject to taxation" from one year to the next, but does not specify what occurs when property, between tax years, undergoes the kind of qualitative transformation that *Arizona Tax Research* describes. We should not pretend that those who voted article IX, section 19, into the Constitution "intended" a precise answer to that question. In this, like many questions of constitutional or statutory interpretation, the answer cannot be deduced; it must be chosen by practical application of a phrase to an uncontemplated event. What Llewellyn wrote of statutory interpretation applies to constitutional interpretation as well:

> [When] language is called upon to deal with circumstances utterly uncontemplated at the time of its passage, ... the quest is not properly for the sense originally intended by the statute, for the sense sought originally to be *put into it*, but rather for the sense which *can be quarried out of it* in light of the new situation.

Karl N. Llewellyn, *Remarks on the Theory of Appellate Decision and the Rules or Canons About How Statutes Are To Be Construed*, 3 Vand.L.Rev. 395, 400 (1950). The court in *Arizona Tax Research* approached the issue in this spirit, and I find its resolution practical, sensible, and sound.

My final reason for deference is an inference that I draw from our supreme court's disposition of *Arizona Tax Research*. The supreme court accepted review of an issue of attorneys' fees in that case, but declined to review its central holding. *Arizona Tax Research Ass'n v. Department of Revenue*, 163 Ariz. 255, 787 P.2d 1051 (1989). One ordinarily attributes no endorsement when that court declines review. *See, e.g., Calvert v. Farmers Ins. Co. of Ariz.*, 144 Ariz. 291, 297 n. 5, 697 P.2d 684, 690 n. 5 (1985) (Denial of review does not imply acceptance of legal analysis or conclusion.). *But see Hagen v. United States Fidelity & Guar. Ins. Co.*, 138 Ariz. 491, 491, 675 P.2d 1310, 1310 (1984) (Denial of review usually attests approval of result, but not necessar-

ily approval of analysis.). Yet the history of *Arizona Tax Research* marks it as no ordinary case. Though that appeal was first filed in the court of appeals, the supreme court accepted it for transfer, tacitly acknowledging its public importance. *Arizona Tax Research Ass'n v. Maricopa County*, No. CV–88–0468–T (Nov. 2, 1988) (minute letter granting Maricopa County's petition to transfer case to Supreme Court). Then, however, faced with the parties' motion for acceleration, the court returned the case to the court of appeals, citing "the need for immediate, thorough consideration of the issues." *Arizona Tax Research Ass'n v. Maricopa County*, No. CV–88–0468–T (Dec. 20, 1988) (order transferring case from Supreme Court to Division Two). This background gives perspective to the court's later action on review. Confronted with a decision of statewide fiscal importance, one that it had acknowledged to require "immediate" disposition, the supreme court would not have taken up the minor issue of attorneys' fees and ignored the constitutional holding, had it found that holding to be wrong. To have done so would have been an act of irresponsibility that I will not attribute to that court.

In conclusion, I believe that the issues of this case were fully and fairly settled in *Arizona Tax Research*. The supreme court, with the opportunity to do otherwise, chose to let that holding stand. In intervening years, tax authorities have undoubtedly acted on the assumption that it is valid law. Our court now unsettles the settled. I would defer.