KLIES ET AL, RESPONDENTS, v. LINNANE, APPELLANT
No. 8544
Submitted February 15, 1945. Decided February 26, 1945.
156 Pac. (2d) 183

Mr. R. V. Bottomly, Attorney General, Mr. I. W. Choate of Helena, and Mr. H. R. Eickemeyer of Great Falls, for Appellant.

Mr. H. C. Hall of Great Falls for Respondents.

MR. CHIEF JUSTICE JOHNSON delivered the opinion of the court.

Defendant county treasurer appeals from a judgment awarded plaintiffs for the recovery of money paid under protest as a tax upon the net proceeds of mines.

The agreed statement of facts recites that during the year 1942 the plaintiffs produced ores containing specified amounts of gold, silver, lead and zinc, which they sold on the open market to purchasers other than the United States Government for $182,382.20; that "in addition to that amount so received by plaintiffs from the sale of said metals, the government of the United States, acting through the Metals Reserve Corporation [Company], paid to plaintiffs as a premium or bonus for the lead and zinc so produced by them the sum of $35,546.48 for the purpose of encouraging the production of said metals over

and above established quotas;" that they were entitled to deduct certain costs for expenses, totaling $191,559.71; that if the premium or bonus received from the government was not properly included as part of the gross value of the metals for the purpose of computing the net proceeds tax thereon, the deductions exceeded the value and no tax was payable; but that if the premium or bonus was properly included for that purpose, a tax of $1,756.79 was due and payable in which event the judgment herein for the recovery of the payment of the first half thereof should be reversed. No other question is presented by this appeal.

Article XII, Sec. 3, of the Constitution of Montana provides that "the annual net proceeds of all mines and mining claims shall be taxed as provided by law." Accordingly the legislature has. enacted the net proceeds tax law, which now appears as Secs. 2089 to 2096.2, Revised Codes of 1935. The statute provides, Sec. 2089, that every person engaged in the mining of certain minerals, including the metals in question, shall report to the state board of equalization "the gross yield" of such minerals by a statement showing, among other things, (1) "the yield of such ores, mineral products or deposits * * * of commercial value" by ounces or pounds of metal, tons of coal, barrels of oil, or cubic feet of natural gas "yielded to such person * * * so engaged in mining"; (2) "the gross yield or value in dollars and cents"; and (3) various deductible expenses, including the actual cost of extraction, transportation, reduction or sale, and marketing or conversion into money.

Sec. 2090 requires the state board of equalization to determine "the net proceeds in dollars and cents * * * yielded to such person * * * by subtracting from the value in dollars and cents of the gross product" the costs specifically allowed by the statute.

Sec. 2090.4 provides that if any report "contains any wilfully false or fraudulent statements as to the gross amount received by any person * * * for any mine's product, then the state board of equalization shall compute the gross value of such

mine's product,'' based upon the average market quotations of those products for the year; it requires the board to make like computations, "if any such person, corporation, or association has sold or otherwise disposed of any of its mine's product at a price substantially below the true market price of such product at the time and place of such sale or disposal,'' the computation to be based upon the quotations or upon the market value at that time and place.

It is, therefore, clear that in the determination of "the valuation of the net proceeds of such mines and mining claims for the purpose of taxation'', Sec. 2091, Revised Codes, the gross value of the product which is the basis for computation, is the money which the producer received or should properly have received upon the bona fide sale of his product. The question here is whether the premium or bonus received from the government, which was not the purchaser of the ores or metals, should be considered as constituting a part of the gross value, or of the proceeds of bona fide sale, of plaintiff's products.

Title 50 U. S. C. Appendix, Sec. 902(e), which is a part of the Emergency Price Control Act, provides: "Whenever the Administrator determines that the maximum necessary production of any commodity is not being obtained or may not be obtained during the ensuing year, he may, on behalf of the United States, * * * make subsidy payments to domestic producers of such commodity in such amounts and in such manner and upon such terms and conditions as he determines to be necessary to obtain the maximum necessary production thereof: Provided, That in the case of any commodity which has heretofore or may hereafter be defined as a strategic or critical material by the President pursuant to Sec. 5d of the Reconstruction Finance Corporation Act (Sec. 609j of Title 15) as amended, such determinations shall be made by the Federal Loan Administrator, with the approval of the President, and, notwithstanding any other provision of this Act, (Secs. 901-946 of this Appendix) or of any existing law * * * such subsidy payments to domestic producers thereof may be

paid, only by corporations created or organized pursuant to such Sec. 5d (Sec. 609j of Title 15); * * * ."

The Metals Reserve Company was created for the purposes mentioned in those federal Acts. It encourages the increased production of strategic metals, including lead and zinc, by paying the producer a premium or bonus for such production in excess of a quota fixed by it for that producer. In this connection two points should be noted. The Metals Reserve Company does not thereby increase the price of the metal, or the amount to be paid by the purchaser for the metal; nor does it pay the premium or bonus upon all the production, but only upon the production in excess of the defined quota. Thus, as intended by the federal statute, it is not production, but increased production, which is encouraged.

Webster's New International Dictionary defines "bonus" as "a subsidy to an industry from a government." It defines "subsidy" as "a grant of funds or property from a government, * * * to a private person or company to assist in the establishment or support of an enterprise deemed advantageous to the public." It is an artificial way of encouraging an industry or enterprise otherwise than by increasing the value of its product.

It is apparent that under natural economic laws the production of lead and zinc ores, as well as of other products, automatically results whenever economically practicable, and that it cannot ordinarily result unless so. Production not otherwise practicable may artificially be made so, either by increasing the price of the product, or by rewarding the production otherwise, as by subsidy or bonus payment. An essential difference between the two methods is that a direct price increase ordinarily not only rewards and thus encourages additional production, but also makes more profitable the production which would have existed without it; on the other hand, the subsidy or bonus method can more practicably be limited in application to the additional production. Either method would tend to increase the production of strategic metals for war purposes by making

profitable an enterprise which otherwise could not pay its way, and, therefore, could not operate. Both methods increase the proceeds and therefore the value of the enterprise by making it profitable, but only the price rise method increases the value of the product. Thus they are similar only in increasing the income from, and the value of, the enterprise.

Defendant argues in his brief that "although the premium or bonus is paid as an inducement to increase production of strategic metals, its effect is to increase the value of such metals to plaintiffs." But its effect is not to increase the value of the metals to plaintiffs or anyone else, for it does not change the prices at which they are bought and sold. Defendant fails to distinguish between the enterprise, the profits and value of which are increased by the bonus or subsidy, and the product itself, the value of which is not thus increased. The killing of bear for bearskins and the production of beets for sugar may not be profitable enterprises. They may be made profitable by a bounty on the killing of bear or the raising of beets, but it cannot be said that such bounty increases the value of the bearskins or the sugar. It is the enterprise, not the product, which has been increased in value. But the tax upon the net proceeds of mines is not based upon the value of the enterprise, nor upon all possible income therefrom. It is based only upon the net value of the ores produced. Income in addition to that received as the net value of the product may perhaps be taxable as income, but it is clearly not taxable as "net proceeds of mines" which the statute identifies as the net value of the product and bases upon the gross proceeds of its bona fide sale.

Webster's New International Dictionary defines "value" as "a fair return in money, goods, services, etc., for something exchanged; that which is considered an equivalent in worth; * * * monetary worth of a thing, marketable price; also, worth as estimated in terms of a currency or of another medium of exchange."

A further examination of the premium or bonus system employed demonstrates the fallacy of defendant's argument

that it is the value of the product which is increased. The Metals Reserve Company has instituted a double premium for zinc production. Under it the normal quota may reflect a normal price of 11¢ per pound. A certain excess production may receive a bonus of 2¾¢ per pound, while still further excess production may receive an additional bonus of that amount. Thus the zinc production of a certain mine, all of which is sold on the market at its value of approximately 11¢ per pound, may under the quota system be additionally rewarded by a bonus of 2¾¢ per pound upon part of the excess and by a bonus of 5½¢ per pound upon the remainder. But can it be said that this zinc, all of it precisely the same, varies in value so that some of it is worth 11¢, some 13¾¢ and some 16½¢ per pound? Obviously, the increase is not in the value of the product but in the income, profitableness and value of the enterprise, upon which the tax in question is not based. The additional income is from a collateral or additional source, not included in the tax base.

Defendant argues further that the premium or bonus plan is part of the emergency price control system, that the effect of that system is to prevent the ascertainment of value in a free market, and that the bonus, together with the sale price, should therefore be considered as the equivalent of that value. But, as noted above, the value, however fixed, is the price paid and received for the metal, and other rewards, incentives or incidental income are not part of that value; they are therefore not part of the tax base.

Defendant cites Sec. 1996, subdivision 5, which defines both "value" and "full cash value" as meaning for taxation purposes "the amount at whch the property would be taken in payment of a just debt due from a solvent debtor," and asks: "Would anybody seriously assert that if plaintiffs in this case had owed a creditor $217,876.68 that creditor would not have been eager and willing to take plaintiffs' total production of metals, including zinc and lead, for what they could be sold for in the market plus the bonus which the Metals Reserve Com-

pany was willing to pay as a bonus or premium for producing them?'' The question must be answered contrary to defendant's apparent view, for the Metals Reserve Company would not pay the bonus to the creditor or other purchaser, but only to the producer.

It is apparent, therefore, that the premium or bonus paid by the government, not as part of a purchase price for the product, but as an inducement for its production, is not a part of the value of the product.

The judgment is affirmed.

Associate Justices Morris, Adair, Angstman, and Cheadle concur.