[No. 30980.   Department Two.   January 18, 1950.]

FISHER FLOURING MILLS COMPANY, *Appellant,* v. THE STATE OF WASHINGTON, *Respondent.*[1]

[1]Reported in 213 P. (2d) 938.

*Graham, Green, Howe & Dunn (James Wm. Johnston,* of counsel), for appellant.

*The Attorney General* and *C. John Newlands, Assistant,* for respondent.

HAMLEY, J.—Plaintiff brought this action to obtain a refund of excise taxes paid to the tax commission of the state of Washington.

The company is engaged in the business of manufacturing and selling flour, cereals, and other grain products at Seattle, Washington. It is accordingly subject to the business and occupation tax imposed by title II of the state revenue act of 1935, as amended.

During the period in question, from January 1, 1944, to June 30, 1946, plaintiff made its business and occupation tax returns on the basis of the value of the products manufactured as measured by the total purchase price received from the purchasers thereof. The flour was sold in accordance with ceiling price regulations established by the office of price administration. Plaintiff also received certain subsidy payments from agencies of the United States government during this period, but did not include these receipts in computing its business and occupation tax.

In May, 1946, the tax commission made an audit of plaintiff's books. Thereafter, pursuant to an administrative ruling which it had previously issued on the point, the tax commission determined that the amount of these subsidy payments should be included as a part of the measure of the value of the flour manufactured by plaintiff. Accordingly, the value of the flour manufactured by plaintiff dur-

ing this period was redetermined by adding to the total receipts from the purchasers of the flour the amount of the subsidy. The tax liability of plaintiff as a manufacturer was recomputed on that basis. As a result, tax deficiencies in the total amount of $12,364.80 plus interest were assessed against and paid by plaintiff. Plaintiff seeks a refund of this sum.

The subsidy payments were received by plaintiff from the Defense Supplies Corporation and its successor, the Reconstruction Finance Corporation, both agencies of the United States government. The subsidy was paid pursuant to the provisions of regulation 4 issued by the Defense Supplies Corporation on November 29, 1943 (9 Federal Register 1822; 32 Code of Federal Regulations 1944 Supp., §§ 7004-1 to 7004-12) on the basis of the number of bushels of wheat ground into flour by plaintiff during this period.

The need for this subsidy arose when OPA, after freezing the price of flour in the fall of 1942 and later fixing maximum specific prices for flour, did not also freeze the price of wheat. During 1943, the price of wheat advanced to a point where it was impossible for flour mills to purchase wheat at the market price, manufacture it into flour, and sell the flour at the price ceiling imposed by OPA. The government decided to meet the situation by itself absorbing the portion of the cost of wheat which was in excess of the amount that millers were able to pay. This excess cost was determined by subtracting from the actual cost of wheat, the cost of wheat at the time the price of flour was frozen, this latter cost being designated as the "basic related wheat price."

Under the subsidy plan adopted, the miller received a fixed sum for each bushel of wheat ground into flour. The operation of the subsidy plan made it possible for the miller, in effect, to purchase wheat at the basic related wheat price, and to realize a margin on flour sold equal to the margin which existed at the time the price of flour was frozen. The underlying purpose of the subsidy, however, as stated in the findings of fact, was to make it possible to pay a greater price to the farmers who raised the wheat. Without the

subsidy, and as long as a ceiling price remained on flour, it would have been necessary to roll back the price of wheat or stop the manufacture of flour.

The trial court held that the subsidy payments were to be considered in computing the tax upon the business and occupation of flour miller, and entered judgment for defendant. Plaintiff has appealed.

The single question presented is whether, in computing the "value of the products manufactured" for the purpose of determining the measure of the business and occupation tax payable by appellant flour miller, the amount of subsidies received from the United States government should be included with the amount received from vendees for sales of flour sold under the OPA price ceiling.

The tax in question is imposed by Rem. Supp. 1943, § 8370-4 [P.P.C. § 965-1] (Laws 1935, chapter 180, as amended by Laws 1943, chapter 156, § 1, p. 487), the pertinent portions of which read:

". . . There is hereby levied and there shall be collected from every person a tax for the act or privilege of engaging in business activities. Such tax shall be measured by the application of rates against value of products, gross proceeds of sales, or gross income of the business, as the case may be, as follows: . . .

"(b) Upon every person engaging within this state in business as a manufacturer; as to such persons the amount of the tax with respect to such business shall be equal to the value of the products manufactured, multiplied by the rate of one-quarter of one per cent."

The method of determining "the value of the products manufactured" is set forth in Rem. Supp. 1941, § 8370-7 [P.P.C. § 965-7] (Laws 1941, chapter 178, § 4, p. 488), as follows:

"The value of products extracted or manufactured shall be determined by the gross proceeds derived from the sale thereof whether such sale is at wholesale or at retail, except:

"(a) Where such products are extracted or manufactured for commercial use;

"(b) Where such products are shipped, transported or transferred out of the state, or to another person, without

prior sale or are sold under circumstances such that the gross proceeds from the sale are not indicative of the true value of the subject matter of the sale.

"In the above cases the value shall correspond as nearly as possible to the gross proceeds from sales in this state of similar products of like quality and character, and in similar quantities by other taxpayers. The Tax Commission shall prescribe uniform and equitable rules for the purpose of ascertaining such values."

Under § 8370-4 (b), the measure of the tax is the *value* of the products manufactured. Section 8370-7 provides that, subject to certain exceptions, the value of products shall be determined "by the gross proceeds derived from the sale thereof" whether such sale is at wholesale or at retail.

■ Were the subsidy payments part of the "gross proceeds derived from the sale" of flour by appellant? We think not. The subsidy payments had no necessary relation to sales. They were paid on the basis of the number of bushels of wheat ground into flour. The term "gross proceeds derived from the sale" plainly means the monetary return from vendees for the actual sale of flour, undiminished by any expenses in connection with the sale. The words "whether such sale is at wholesale or at retail" indicate that only the proceeds of bona fide sales were to be included. The subsidy payments were income, and they tended to increase the value of the *enterprise* and the profits of the *business*. But they did not increase the value of the *products* —that value was established by the market price at which they sold.

This distinction between the value of the enterprise and the value of the products was clearly pointed out in *Klies v. Linnane,* 117 Mont. 59, 156 P. (2d) 183. In that case, the court was called upon to decide whether subsidy payments made to mining companies by the Metals Reserve Corporation for the purpose of stimulating the production of lead and zinc during the war, should be included as a part of the "gross value" of the metals produced, for the purpose of computing the net proceeds tax on mines imposed by §§ 2089 to 2096.2, Revised Codes of Montana, 1935. In holding that

the amount of such subsidy payments should not be included, the court said (at p. 63):

"Defendant argues in his brief that 'although the premium or bonus is paid as an inducement to increase production of strategic metals, its effect is to increase the value of such metals to plaintiffs.' But its effect is not to increase the value of the metals to plaintiffs or anyone else, for it does not change the prices at which they are bought and sold. Defendant fails to distinguish between the enterprise, the profits and value of which are increased by the bonus or subsidy, and the product itself, the value of which is not thus increased. The killing of bear for bearskins and the production of beets for sugar may not be profitable enterprises. They may be made profitable by a bounty on the killing of bear or the raising of beets, but it cannot be said that such bounty increases the value of the bearskins or the sugar. It is the enterprise, not the product, which has been increased in value. But the tax upon the net proceeds of mines is not based upon the value of the enterprise, nor upon all possible income therefrom. It is based only upon the net value of the ores produced. Income in addition to that received as the net value of the product may perhaps be taxable as income, but it is clearly not taxable as 'net proceeds of mines' which the statute identifies as the net value of the product and bases upon the gross proceeds of its bona fide sale."

The more recent case of *Combined Metals Reduction Co. v. State Tax Commission,* 111 Utah 156, 176 P. (2d) 614, might appear to state a contrary view. The mining companies involved in that case sold copper, lead and zinc to private industries at the maximum OPA prices and then received a subsidy in the form of "premium payments" from the Metals Reserve Company for all metals produced in excess of the quotas assigned to each company respectively. Utah imposed an occupation tax equal to one per cent of the "gross amount received for or the gross value of metaliferous ore sold." The tax commission of that state held that the premium payments must be included in computing this tax. The Utah court upheld that contention.

The decision in the Utah case, however, involved a subsidy of a different character than we have before us in this

case. Here, the subsidies were paid for *manufacturing* flour, whether or not it was sold. In the Utah case, the premium payments were made only for such metals as were not only produced, but also sold. The Utah court placed great reliance upon that factor, and justifiably so. If subsidies are paid in connection with sales, there is a logical basis for requiring that they be considered in computing the proceeds of sales. There is no such basis where subsidies are related only to production.

Section 8370-7, quoted above, sets forth certain circumstances under which the value of products manufactured shall not be determined by the gross proceeds derived from the sale thereof. Among these are cases where the products are sold under circumstances such that the gross proceeds from the sale "are not indicative of the true value of the subject matter of the sale (subparagraph (b))." It is further provided that:

"In the above cases the value shall correspond as nearly as possible to the gross proceeds from sales in this state of similar products of like quality and character, and in similar quantities by other taxpayers. The Tax Commission shall prescribe uniform and equitable rules for the purpose of ascertaining such values."

It is argued that, because the maximum price of flour was fixed by OPA regulations, the proceeds from such sales are not indicative of the true value of the subject matter of the sale, thus calling for application of the alternative method of computing value, as quoted above. But, assuming that this is true, the application of the alternative method leads to the same result. Under that method, the value is to correspond "as nearly as possible" to the gross proceeds from sales in this state of similar products of like quality and character, and in similar quantities by other taxpayers. Since all sales of flour were governed by the same OPA regulations, such computation of value would be just the same as if governed by the proceeds of actual sales made by appellant.

Respondent urges that such an application of the alternative method would only lead to a circular result (which is of

course true), and that the tax commission was justified in avoiding such result by declaring that subsidy payments should be included. But there is nothing in the statute authorizing the tax commission to promulgate this wholly different alternative method, however equitable it might appear to be. The plain fact is that the legislature did not contemplate this kind of situation. In providing for the alternative method of computing value, the legislature had in mind cases where individual sales are made under special arrangements whereby the manufacturer receives less than the going market price. This is clearly shown by the nature of the alternative method which is provided in § 8370-7.

Our interpretation of the taxing statute in effect during the period in question finds support and confirmation in what later transpired. When this particular problem came to the attention of the legislature in 1949, it amended the statute to specifically provide for the inclusion of subsidy payments. Section 8370-7 was amended by Laws of 1949, chapter 228, § 3, p. 823 (Rem. Supp. 1949, § 8370-7), to read as follows:

"The value of products, including by-products, extracted or manufactured shall be determined by the gross proceeds derived from the sale thereof whether such sale is at wholesale or at retail, *to which shall be added all subsidies and bonuses received from the purchaser or from any other person with respect to the extraction, manufacture, or sale of such products or by-products by the seller,* except:

"(a) Where such products, including by-products, are extracted or manufactured for commercial or industrial use;

"(b) Where such products, including by-products, are shipped, transported or transferred out of the state, or to another person, without prior sale or are sold under circumstances such that the gross proceeds from the sale are not indicative of the true value of the subject matter of the sale.

"In the above cases the value shall correspond as nearly as possible to the gross proceeds from sales in this state of similar products of like quality and character, and in similar quantities by other taxpayers, *plus the amount of subsidies or bonuses ordinarily payable by the purchaser or by any third person with respect to the extraction, manufacture, or*

*sale of such products.* The Tax Commission shall prescribe uniform and equitable rules for the purpose of ascertaining such values." (Italics ours.)

■ When the legislature enacts an amendatory statute, a presumption exists that a change was intended. *Longview Co. v. Lynn,* 6 Wn. (2d) 507, 108 P. (2d) 365; *Alexander v. Highfill,* 18 Wn. (2d) 733, 140 P. (2d) 277; 50 Am. Jur. 261, Statutes, § 275. This presumption may be rebutted if surrounding circumstances indicate that the legislature intended merely to *interpret* the original act. *State ex rel. Oregon R. & Nav. Co. v. Clausen,* 63 Wash. 535, 116 Pac. 7; 1 Sutherland, Statutory Construction (3rd ed.), § 1930. But the 1949 statute quoted above does not purport to interpret the term "value of products," as previously used. Instead, it specifically gives the term a new meaning which it never had before.

■ If the 1949 statute had been intended as a clarification of the existing law, the new language which has been added for the purpose of referring to subsidy payments would have begun with some such phrase as "in which shall be *included* all subsidies and bonuses." But the language italicized in the above quoted section actually begins "to which shall be *added* all subsidies and bonuses." This plainly indicates that subsidies and bonuses were never regarded by the legislature; either in 1949 or prior thereto, as *part* of the proceeds from the sale of products, but were now (beginning with the 1949 act) to be "added" to those proceeds.

This construction of the 1949 amendment is confirmed by the second amendatory clause added to § 8370-7, also shown in italics above. That new clause begins with the words: *"plus* the amount of subsidies or bonuses," thus indicating that subsidies and bonuses were not considered as included as part of the proceeds from sales, but were to be added thereto.

■ Respondent contends that the business and occupation tax is a gross income tax, and therefore the legislature intended to tax the manufacturers' gross income from whatever source derived. *Gwin, White & Prince v. Henne-*

*ford,* 193 Wash. 451, 75 P. (2d) 1017 (reversed on other grounds in 305 U. S. 434, 83 L. Ed. 272, 59 S. Ct. 325), and *Bloxom v. Henneford,* 193 Wash. 540, 76 P. (2d) 586, are cited in support of this view.

In the *Gwin* case, the tax imposed by title II, chapter 180, Laws of 1935, is referred to as "an occupation tax for the act or privilege of engaging in business." The court then says (p. 454): "The tax is measured by a percentage of the gross income solely of that business." Respondent contends that, by these words, this court has declared that all taxes levied under title II are gross income taxes. These words, standing alone, are susceptible of such a construction. But the court was not there dealing with all taxes levied under title II, and the declaration or characterization referred to should accordingly be considered only as applying to the particular kind of tax there in question.

The *Gwin* case involved a company which operated as a marketing agent for fruit growers. The measure of the tax expressly imposed by the statute upon that business category was the "gross income of the business." What the court said was undeniably pertinent to that particular category. The act classifies several other business categories and sets up two additional methods of measuring the tax, one being "gross proceeds of sales," and the other (applicable in the instant case) being "value of products." None of these other categories and neither of these other methods of measuring the tax were in any way involved in the *Gwin* case and are not mentioned in the opinion.

The *Bloxom* case involved a provision of the statute (§ 8), now repealed, imposing a tax on jobbers of agricultural products measured by "gross earnings." The pertinent section defined the term "gross earnings" to mean "the gross proceeds of sales *less* [italics ours] the amount of the purchase price paid" for them. Thus, on its face, the tax there involved was not a gross income tax. It was not so characterized by the court, but was termed a "gross proceeds tax."

We find nothing in the *Gwin* and *Bloxom* cases to support the view that the business and occupation tax imposed upon persons engaging in business as manufacturers, which tax is to be measured by the "value of the products manufactured," is a gross income tax.

■ We are mindful of the fact that the tax commission, on November 3, 1943, issued an administrative ruling in which it was declared that there must be included, as a part of the measure of the tax under the "manufacturing" classification of title II, all subsidy payments received. Administrative Ruling, vol. II-AR, No. 1. The tax commission is given power to promulgate rules for the ascertainment of the taxes imposed (Rem. Rev. Stat. (Sup.), § 8370-208 [P.P.C. §962-45]), and for the ascertainment of values (Rem. Supp. 1941, § 8370-7). Administrative regulations of this kind are to be given great weight in resolving doubtful meanings of taxing laws. 3 Sutherland, Statutory Construction (3rd ed.) § 6709.

It is well established, however, that an administrative agency may not, by means of an interpretative or clarifying regulation, actually modify or amend the statute in question. In *Washington Printing & Binding Co. v. State,* 192 Wash. 448, 455, 73 P. (2d) 1326, involving a tax commission regulation pertaining to the statutory definition of sales at retail, we said:

"The tax commission cannot, by such rule, impose a tax upon property or a transaction that is not mentioned in the statute as taxable. The rule-making power is given only for the purpose of empowering the commission to carry out the provisions of the statute."

See, also, *Pacific Tel. & Tel. Co. v. Henneford,* 195 Wash. 553, 81 P. (2d) 786; *Northern Pac. R. Co. v. Henneford,* 9 Wn. (2d) 18, 113 P. (2d) 545.

We believe that the tax commission ruling of November 3, 1943, amounted to an attempted amendment of the act. Whereas, under § 8370-7, as it read prior to 1949, the value of products manufactured was to be determined solely by reference to the gross proceeds derived from the

*sale* of manufactured articles, the regulation sought to include subsidy payments which were not related to sales but were related to the manufacturing process.

The judgment is reversed and the cause remanded, with instructions to enter judgment for appellant.

ROBINSON, MALLERY, and HILL, JJ., concur.

SIMPSON, C. J., dissents.

