# IN THE OREGON TAX COURT

Charles A. KELLER

*v.*

DEPARTMENT OF REVENUE

(TC 3163)

Michael McCASLIN
and Elizabeth McCaslin

*v.*

DEPARTMENT OF REVENUE

(TC 3164)

Richard B. KELLER, II

*v.*

DEPARTMENT OF REVENUE

(TC 3165)

Richard B. KELLER
and Ruth E. Keller

*v.*

DEPARTMENT OF REVENUE

(TC 3166)

Dennis B. KRANZ

*v.*

DEPARTMENT OF REVENUE

(TC 3194)

Milo E. Ormseth and Frank Dinces, Stoel Rives Boley Jones & Grey, Portland, represented plaintiff.

Jerry Bronner, Assistant Attorney General, Department of Justice, Salem, represented defendant.

Decision for defendant rendered February 23, 1993.

**CARL N. BYERS, Judge.**

These cases have been consolidated and submitted on stipulated facts because they involve a common legal issue. Plaintiffs are individuals who were residents of Oregon during one or more of the years 1986, 1987 or 1988. Through their business enterprises, they became subject to the Business and Occupation (B & O) Tax imposed by the state of Washington. Plaintiffs initially claimed a deduction on their Oregon returns for the taxes paid to Washington. Later, they filed claims for refunds on the ground that ORS 316.082 entitled them to a credit rather than a deduction.

ORS 316.082(1) provides:

"A resident individual shall be allowed a credit against the tax otherwise due under this chapter for the amount of *any income tax* imposed on the individual, or on an Oregon S corporation of which the individual is a member (to the extent of the pro rata share of the individual of the S corporation), for the taxable year by another state of the United States or the District of Columbia on income derived

from sources therein and that is also subject to tax under this chapter."[1] (Emphasis added.)

## ISSUE

The issue is whether B & O taxes are income taxes within the meaning of ORS 316.082.

## WASHINGTON TAX SCHEME

Washington imposes no personal income tax or corporate income tax. It does impose a wide variety of excise taxes. The B & O tax is an excise tax imposed on the privilege of engaging in business. Wash Rev Code § 82.04.220.[2] Different measures of the tax are used for different types of businesses. For example, "gross income of the business" is used for service businesses, Wash Rev Code § 82.04.290, "gross proceeds of sales" for retailers, Wash Rev Code § 82.04.250, and "value of the products" for manufacturing businesses, Wash Rev Code § 82.04.240.

Washington also imposes a retail sales tax based on the gross proceeds of sale. Wash Rev Code § 82.08.020. Although the tax must be collected by the seller, it is imposed on the buyer. Wash Rev Code § 82.08.050. The sales tax is reinforced by a use tax imposed on the privilege of using property. The measure of the use tax is the value of the property. Wash Rev Code § 82.12.020.

## BACKGROUND OF TAX CREDIT

The predecessor to ORS 316.082, OCLA § 110-1605a, allowed a tax credit for "net income taxes imposed by and paid to another state or country." In 1951, the legislature amended the statute by deleting the word "net." Or Laws 1951, ch 203, § 1. Plaintiffs contend that, by this change, the legislature intended "income" to be used in its broadest sense. In support of their position, plaintiffs cite the State Tax Commission regulation. Prior to the 1951 amendment, the regulation denied a credit for taxes paid on gross receipts, gross income and dividends, etc. *See* State of Oregon,

---

[1] The language providing for S corporations was added by the 1987 legislature and, therefore, does not apply to 1986. *See* Or Laws 1987, ch 647, §§ 11, 14.

[2] All references to the Washington Revised Code are to the law as of 1988.

*Personal Income Tax Law and Regulations*, Art 605a-1-a(1) (1947). However, in response to the 1951 amendment, the regulation was amended to provide:

> "Credit is limited to taxes imposed upon income, but may be claimed with respect to gross income taxes as well as net income taxes. No credit is allowed with respect to property, transaction, sales or consumption taxes, nor with respect to occupational licenses unless they are imposed upon income." State of Oregon, *Personal Income Tax Law and Regulations*, Art 605a-1-a(3) (1951).

The interpretation of the statute by the State Tax Commission is given significant weight.

> "Although such rules promulgated by the Tax Commission or other state administrative agency are not controlling, their contemporaneous construction of an act is, nevertheless, highly persuasive, especially where such rules have been in effect for a long term of time as a basis for determining technical and involved matters such as here presented." *Keyes v. Chambers et al*, 209 Or 640, 661, 307 P2d 498 (1957).

Plaintiffs view the B & O taxes as an occupational license tax imposed on income. They assert that defendant allowed a credit for such taxes until the years in question. Defendant denies this. It does appear that defendant allowed some of the plaintiffs a credit for one of the years in question, but defendant claims this was done in error.

## CONSTRUCTION OF STATUTE

In close cases, as this one is, the court must pay particular heed to the rules governing construction of tax credit statutes. Applying the pre-1951 law, the court in *Keyes* held that a Canadian gross income tax on dividends did not qualify as a "net income tax." 209 Or at 662. That case sets forth appropriate guidance for application of the statute in this case.

> "A provision allowing a credit against a state tax is, in effect, an exemption from liability for a tax already determined and admittedly valid. It is, therefore, in order to note before proceeding further that such credits, deductions or exemptions as the legislature may allow in the computation of an

income tax are privileges accorded as a matter of legislative grace and not as a matter of taxpayer right. By reason of their character as legislative grants, statutes relating to deductions allowable in computing income must be strictly construed against the taxpayer and in favor of the taxing authority. The rule of strict construction to which we refer is equally applicable to tax credits. A 'credit' to a tax has a far greater impact on the ultimate liability of the taxpayer than an allowable deduction and, therefore, is an item of greater importance as a subject for strict construction in favor of the government." *Id.* at 645-46. (Citations omitted.)

The taxpayers have the burden of showing they come within the ambit of the statute. Any doubts are resolved against them.

"In fact, if there is even a doubt whether the legislature granted a deduction or exemption, the presumption is that the legislature did not so provide and we have so held. 'No exemptions should be allowed, therefore, unless they are plainly warranted, and the intent of the legislature to exempt must be clear beyond a reasonable doubt. * * * An intention to exempt will not be implied from language which is susceptible of any other reasonable interpretation.' " *Unander v. Pasquill et al*, 212 Or 213, 223, 319 P2d 579 (1957) (quoting *Allen v. Multnomah County*, 179 Or 548, 552-53, 173 P2d 475 (1946)).

## ANALYSIS

Plaintiffs argue that the history of the statute shows they are clearly within its intended grace. However, the history only indicates an intent to remove the requirement that it be a "net" income tax. There is no indication of an intent to expand the concept of an income tax.

■ Although there are conflicting authorities, generally an income tax is considered a direct tax and an excise tax an indirect tax.

"[E]xcises are defined as 'taxes laid upon the manufacture, sale or consumption of commodities within the country, upon licenses to pursue certain occupations, and upon corporate privileges.' As thus defined, excise taxes come to have a more or less precise meaning. They are an indirect tax and have no reference to earnings or income except that the sum

of such earnings or income may be made the measure of the tax." 1 Cooley, *The Law of Taxation*, 127 § 42 (4th ed 1924) (footnotes omitted).

In contrast, the same author observes:

"An income tax is one levied on the income from property or an occupation. It is a direct tax upon the thing called income. It is a special rather than a general tax. An excise upon those engaged in a particular occupation, although graded in accordance with income, is an occupation tax and not an income tax." *Id.* 138-39, § 49 (footnotes omitted).

■ There is a different orientation between an income tax and an excise tax. An income tax is not conditioned on engaging in any particular activity or the exercise of a privilege. The B & O tax is. The difference between an income tax and an excise tax has been thoroughly considered by the courts in Washington.[3] Based on Washington's particular constitution, income taxes are deemed a type of property tax. *Culliton v. Chase*, 174 Wash 363, 25 P2d 81, 83 (1933). On the same day, the court also found the B & O tax to be an excise tax. *State ex rel. Stiner v. Yelle*, 174 Wash 402, 25 P2d 91 (1933). In so doing, the court stated:

"This act does not concern itself with income which has been acquired, but only with the privilege of acquiring, and that the amount of the tax is measured by the amount of the income in no way affects the purpose of the act or the principle involved." *Id.* at 407.

The difficult question of classification has also been dealt with on the national level. When Congress attempted to impose an income tax, the Supreme Court held the income tax was a "direct" tax that must be apportioned. The court made it clear that the same did not hold true for an excise or indirect tax. *Pollock v. Farmers' Loan & Trust Co.*, 158 US 601, 628, 15 S Ct 912, 39 L Ed 1108, *modifying* 157 US 429, 15 SC 673, 39 L Ed 759 (1895). This view required adoption of the 16th Amendment to the United States Constitution before an income tax could be levied. Despite the passage of time, the distinctions have remained. *See, for example, Steward Machine Co. v. Davis*, 301 US 548, 57 S Ct 883, 81 L Ed 1279

---

[3] *See* Comment, *A Study of State Taxation in Washington*, 33 Wash L Rev 398 (1958).

(1937) (social security tax held an excise tax) and *Miller Charitable Fund v. Commissioner*, 89 TC 1112, 1121 (1987) (tax on private foundations an excise tax).

The focus of the B & O tax is on business activity, not income. In *Fisher Flouring Mills Co. v. State*, 35 Wash 2d 482, 213 P2d 938, 940 (1950), the Washington Supreme Court held that government subsidies were not included in "value of the products manufactured," the measure of the B & O tax on manufacturing businesses. The court stated:

> "The subsidy payments were income and they tended to increase the value of the *enterprise* and the profits of the *business*. But they did not increase the value of the *products* — that value was established by the market price at which they sold." (Emphasis in original.)

In that case, the respondent contended the B & O tax was a gross income tax. The court found that, at least as to manufacturers, the B & O tax was not a tax on gross income.

As indicated above, this is a close case. It is possible that B & O taxes using the measure "gross income of the business" are just as comprehensive, if not more so, than a personal income tax. However, it is doubtful the Oregon legislature intended the credit to apply to an excise tax merely because the measure of the tax referred to income. Oregon has long recognized a difference between an income tax and an excise tax.

> "An occupation tax is a form of excise tax. It is a tax imposed upon a person for the privilege of carrying on a business, trade or occupation." *Eugene Theatre et al v. Eugene et al*, 194 Or 603, 627-28, 243 P2d 1060 (1952). (Citations omitted.)

## CONCLUSION

In conclusion, plaintiffs have not clearly shown they are within ORS 316.082. In using the term "income tax," the statute requires the tax to be imposed on income. While the measure of the income tax may be irrelevant, whether "gross," "adjusted gross," "net," "flat" or "basic," the subject of the tax must be "income." The Washington B & O tax is not a tax on income. It is a tax on business activities. The court finds the Washington B & O taxes are not "income taxes" within the meaning of ORS 316.082. Judgment will be

entered sustaining defendant's opinion and orders in the above cases.

Costs to defendant.

## IN THE OREGON TAX COURT

Glenn G. MORRIS

*v.*

## DEPARTMENT OF REVENUE

(TC 3229)

Plaintiff appeared *pro se.*

Rochelle Nedeau, Assistant Attorney General, Department of Justice, Salem, represented defendant.

Decision for defendant rendered February 23, 1993.

### CARL N. BYERS, Judge.

Plaintiff seeks an income tax refund and a Homeowner and Renter (HARRP) refund for 1984. The evidence at trial established that defendant did not receive anything from plaintiff for 1984 until April 18, 1988.[1] On that date, defendant received a Form 40S, containing plaintiff's name, address, social security number and telephone number. It contained no information with regard to his income. Plaintiff also attached HARRP refund claim Form 70R. This document contained the same identifying information, but no income information. It did show the assessed value of plaintiff's property and the amount of property taxes paid. However, no amount was shown as a refund claimed.

---

[1] Although the return was not received until April 18, 1988, it would be deemed filed on the date it was mailed, which was April 15, 1988.

On May 25, 1988, defendant returned the forms to plaintiff with a form letter indicating the return was "incomplete." The form letter instructed plaintiff to "complete substitute wage slip (Form 150-206-005)" and return the "completed return" to the department. On April 18, 1989, defendant received a 1984 return designated "amended." This return contained income information.

Defendant denied plaintiff's personal income tax refund and HARRP refund because the claims were filed more than three years after the due date. ORS 314.415(1)(b) and ORS 310.706(3) require refund claims to be filed not later than three years from the date the return was due. Defendant found that the initial filing received by defendant on April 18, 1988, did not constitute a return. Since this was the last possible day for filing a claim for a refund, any subsequent filing or act would be too late.

The primary issue presented by the evidence is whether the initial form filed on April 15, 1988, constituted an income tax return or a HARRP refund claim.

■ The court finds that the form filed by petitioner on April 15, 1988, constituted neither an income tax return nor a claim for refund. The absence of any information relating to the taxpayer's income deprives Form 40S of the character of an income tax return. *See Dept. of Rev. v. Hoyt,* 8 OTR 367 (1980). Likewise, the Form 70R cannot constitute a claim for refund since no amount was claimed.

■ Any action which took place after the refund periods had expired, including any conversations which may have occurred between plaintiff and defendant's auditor, are irrelevant. Under the law, later actions cannot resurrect a right or claim which has already expired. Accordingly, the court finds that defendant's Opinion and Order No. 90-3235 must be sustained.

Costs to neither party.

IN THE OREGON TAX COURT

J. R. SIMPLOT COMPANY
*v.*
DEPARTMENT OF REVENUE
LAMB-WESTON, INC.,
*Intervenor*
(TC 2885)

UMATILLA COUNTY
*v.*
DEPARTMENT OF REVENUE
LAMB-WESTON, INC.,
*Intervenor*
J. R. SIMPLOT COMPANY,
*Intervenor*
(TC 2962)

Steven H. Corey and Timothy O'Rourke, Corey, Byler, Rew, Lorenzen & Hojem, Pendleton, represented plaintiff/intervenor J. R. Simplot Co.

Marilyn J. Harbur and James C. Wallace, Assistant Attorneys General, Department of Justice, Salem, represented defendant.

Richard A. Hayden, Bogle & Gates, Portland, represented Lamb-Weston, Inc., intervenor.

No appearance by plaintiff Umatilla County.

Decision for defendant rendered March 19, 1993.

**CARL N. BYERS, Judge.**

These suits concern the value of Simplot's potato processing facility near Hermiston for 1984, 1985 and 1986. In 1984, Simplot appealed its assessed value to the board of equalization. The board ordered the value reduced to $36,056,150. The assessor appealed that order to defendant. After a hearing, defendant increased the value to $39,132,160, and Simplot appealed to this court.

On January 19, 1990, this court ordered defendant to hold a hearing on the merits concerning 1985 and 1986. *J. R. Simplot Co. v. Dept. of Rev.*, 11 OTR 309 (1989). After holding a hearing as ordered, defendant reduced the value to $20,700,000 for 1985 and to $20,600,000 for 1986. The assessor then appealed to this court. The cases have been consolidated for trial.

The property is a large, integrated facility which processes raw potatoes into frozen french fries and preformed potato products, such as hash browns. Virtually all of the production is sold to a leading international fast food chain. The facilities include the buildings and equipment necessary to receive, store, clean and sort potatoes, which are then

peeled, trimmed, cut, graded, sorted, blanched, fried, defatted, frozen, inspected, packed and shipped. There is also an office, cafeteria, state inspection building, maintenance building and laboratory. The plant contains approximately 331,370 square feet of gross floor area.

## STATUTORY ELECTION

Simplot elected to have the plant valued under ORS 308.411.[1] That statute raises significant problems of application and merits discussion at length.

Except as provided by subsections (2) through (9), ORS 308.411(1) requires industrial plants to be valued at true cash value using the three traditional approaches to value. Subsection (2) states:

> "The owner of a plant may elect to have the plant appraised and valued for ad valorem tax purposes excluding the income approach to valuation and *excluding taking into consideration functional and economic obsolescence in the utilization of any approach to valuation.*" (Emphasis added.)

Subsection (3) provides the manner by which an election is made. If the owner does not make the election, subsection (4) requires the owner to furnish income and expense information to the department to enable it to determine the true cash value of the plant. If an owner makes the election, subsection (5) prohibits the owner from introducing evidence relating to the use of the income approach or the allowance of obsolescence. If an owner wants to rescind the election for a following year, subsection (6) requires the owner to "demonstrate" the need for the income approach or the allowance of functional and economic obsolescence to arrive at true cash value. Subsection (7) permits the owner to request a conference after a plant has been appraised and subsection (8) excuses an electing owner from furnishing any income or expense information. Subsection (9) states in part:

> "In no event shall the application of subsection (2) of this section operate to value an industrial plant below its true cash value for ad valorem tax purposes * * *."

The terms "functional obsolescence" and "economic obsolescence" are not defined by statute or defendant's

---

[1] All references to ORS 308.411 are to the 1983 Replacement Part.

administrative rules. The common meaning of functional obsolescence is depreciation or loss in value due to changes in technology or design, improved processes, materials, and other such improvements. *See* Appraisal Institute, *The Appraisal of Real Estate*, 352-58 (10th ed 1992). Economic obsolescence or external obsolescence is loss in value due to forces from outside the property, such as neighborhood decline, market or industry changes and general economic conditions. *Id.* at 358-59.

■ In summary, ORS 308.411(2) enables a plant owner to keep income and expense information confidential and out of the hands of the taxing authorities. However, this advantage is obtained at a price: the assessed value of the plant will likely exceed its true cash value.[2] In fact, it is misleading to think in terms of true cash value. It is more accurate to think in terms of the "elected" value.

## LEGISLATIVE HISTORY

ORS 308.411 arose out of the concern of industrial plant owners that confidential income and expense information obtained under defendant's subpoenas would become known to competitors. Industry proposed legislation to protect plant owners from such forced disclosure. *Hearing on HB 2928 before the 1981 House Revenue Committee* (Tape 101, Side A) (statements of Rep Markham and Sen Kitzhaber). At the legislative hearings, the department presented its need for such information. *Id.* (Tape 102, Side B) (statement of Robyn Godwin). After prodding by the legislature, industry and department representatives worked out a compromise which became ORS 308.411. *See* Or Laws 1981, ch 139, § 2.

The compromise recognized the three traditional appraisal approaches to valuing property: the cost approach, the sales comparison or market approach and the income approach. The participants were aware that income and expense information is used in all three approaches to varying degrees.[3] Nevertheless, it appears the legislature intended to

---

[2] By making an ORS 308.411 election, a party makes an "*irrevocable waiver* of any subsequent claim that the failure of the assessor or the department to consider the income approach or functional or economic obsolescence resulted in a valuation in *excess of true cash value* * * *." ORS 308.411(9) (emphasis added).

[3] Robyn Godwin, then director of the Department of Revenue, in his testimony,

exclude only the income approach entirely. The cost approach and the sales comparison approach were to be used, but without considering obsolescence. It was made clear this could result in an assessed value greater than true cash value.[4]

## STATUTORY CONSTRUCTION

The court's primary duty is to ascertain the intent of the legislature. *Whipple v. Howser*, 291 Or 475, 632 P2d 782 (1981). Although this is done by focusing on the words used in the statute, words do not always reflect legislative intent. In the most difficult cases, a court may even have to modify the meaning of sentences in order to reconcile legislative intent with the realities present. *Holman Tfr. Co. et al v. Portland et al*, 196 Or 551, 565, 249 P2d 175, 250 P2d 929 (1952).

The statutory language used in ORS 308.411(2) is very broad. ''Excluding'' consideration of obsolescence undercuts the very foundation on which all appraisal approaches rest: the principal of substitution.

> *''The principal of substitution states that when several similar or commensurate commodities, goods, or services are available, the one with the lowest price attracts the greatest demand and widest distribution.''* Appraisal Institute, *The Appraisal of Real Estate* 39 (10th ed 1992) (emphasis in original).

Excluding ''consideration'' of obsolescence, means it cannot be weighed or taken into account in forming an opinion of value. This is what the owner ''elects.'' Thus, the election is to have the property assessed at a value which is something other than true cash value or market value. Subparagraph (5) directs that no ''allowance'' be made for obsolescence. This wording might imply that only specific deductions are prohibited. However, such an interpretation

---

pointed out that income and expense information is used in all three approaches. *See Hearings on HB 2928 before the 1981 House Revenue Committee* (Tape 102, Side B).

[4] In one of the legislative hearings, a committee member explained why the plant owner had to be careful in making the election.

''And he can't complain thereafter that his election resulted in something in excess of true cash value. We have to remember that it is the industry that is asking for this bill * * *.'' *Hearings on HB 2928 before the 1981 House Revenue Committee* (Tape 165, Side A) (Statement of Rep Schoon).

would be inconsistent with the election made by the owner in subsection (2). To value a plant without "consideration" of obsolescence means that obsolescence will not be considered, whether specifically deducted or not.

When seeking true cash value or market value, an appraiser must consider not only obsolescence and physical depreciation, but also their combined effect.

> "Even when depreciation is measured simply by a comparison between the *future retirement dates of the old* asset and of the hypothetical substitute asset, as under the straight-line method, the appraiser must usually consider the *combined* effect of wear and tear and obsolescence in forecasting when the retirement will be made." I Bonbright, *Valuation of Property* 197 (1937) (emphasis in original).

Although the legislature may not have intended the sales comparison approach to be excluded from use, it apparently did not understand that approach. In using that approach on industrial plants, an appraiser *must* consider obsolescence in order to determine if the plants are comparable. A hypothetical example will illustrate this point. Assume the subject property is an old plant with a $60,000,000 reproduction cost new; the "comparable" sale is a newer plant which sold for $55,000,000 but has a reproduction cost new of only $50,000,000. Also assume that both plants have the same capacity and actually produce the same number of pounds of product. Given these facts, there is no way of knowing whether the subject property is worth more or less than the comparable sale plant without considering obsolescence.

## THE COST APPROACHES

Simplot's evidence included three separate cost approaches, one by Consilium, one by Mr. Slack and one by American Appraisal Company. Mr. Ulrich, a Consilium appraiser with extensive experience in appraising potato processing plants, testified for Simplot. He reviewed the subject property in 1984 and appraised it for January 1, 1987. Mr. Ulrich did a full inventory for the 1987 appraisal. This was adjusted back, based on additions and deletions reported and discussions with plant personnel, to reflect the property as it existed on January 1, 1985, and January 1, 1986. Mr. Ulrich

viewed the plant as "basically state-of-the-art" with no significant elements of obsolescence.

■      However, Consilium's allowances for depreciation included elements of functional and economic obsolescence. Mr. Ulrich testified that the buildings and structures were depreciated "based upon the effective age of the building and its normal economic life." Machinery and equipment was depreciated "for the condition and utility of the subject units." These kinds of measures are intended to arrive at true cash value. Here, it must be remembered, the goal is not market value. The goal is a value higher than market value because the market considers functional and economic obsolescence. The court cannot consider Consilium's mixed approach to depreciation because it cannot evaluate that kind of evidence without considering obsolescence. Therefore, no weight can be given to the value indicated by Consilium's cost approach.

Based on asset listings furnished to him by Consilium and additional information, Mr. Slack appraised the plant using a reproduction cost approach. His estimate of reproduction cost new appears low, due in part to inadequate estimates for installation or assemblage costs. Also, many of his estimates lack the specificity which aids in persuasion. For example, his listing of the frozen french fry grading system in a freezing tunnel runs seven pages in length but shows only a single estimated depreciated value. Although Mr. Slack testified that he applied only physical depreciation, the court finds otherwise. His testimony described extensive functional obsolescence. Mr. Slack described the facility as the "biggest research and development laboratories that makes money that I've ever been through." He described many changes made to the plant, the great majority of them for reasons of functional or economic obsolescence. The court finds that the preponderance of the evidence shows that the majority of the replacements and changes in the subject property have been due primarily to technological or functional necessity, not physical wear and tear.

Simplot also offered the testimony of Mr. Watson of the American Appraisal Company who performed a reproduction cost new approach for 1987. This is not one of the years at issue and the evidence was offered only to show that how few

technological changes took place over time. Although Mr. Watson also purported to deduct only for physical depreciation, his opinion focused on market value. He stated "what we're searching for here is market value." To arrive at market value, he applied depreciation "predominantly" on an age-life basis, looking at the "normal" life of equipment. He admitted that his depreciation estimates for the buildings had some elements of obsolescence in them.

Ms. Daniell testified for defendant. She used a trended investment cost method (TICM). This method utilizes the property owner's cost records. These historical costs are trended to bring them up-to-date for the year in question and then reduced for depreciation. Her total trended historical costs gave a reproduction cost new which was then depreciated based on estimated lives. In estimating depreciation, machinery and equipment were broken into two separate groups, one having an estimated life of 12 years and the other having a life of 20 years. Buildings and structures were depreciated on a straight-line basis using a 40-year life. If equipment was still being used, it was not depreciated below 20 percent.

Simplot challenged the accuracy of this appraisal because there were no actual invoices or records of capital improvement projects for property constructed or purchased prior to 1981. This included 90 percent of the buildings and 83 percent of the machinery and equipment. For this information, Ms. Daniell relied upon Simplot's asset listing, which she testified would be more accurate than for later years when Simplot was making piecemeal changes. Ms. Daniell testified that Simplot never corrected its asset listing or indicated it was inaccurate. Ms. Daniell's approach resulted in an indicated value of $46,000,000 for 1984 and $43,000,000 for 1985 and 1986.

■ The court finds that Simplot's estimates of reproduction cost new are less reliable than defendant's estimates. Consilium's cost approach was based on the work of Messrs. Margreiter and Lessard. Although they were supervised by Mr. Ulrich, neither testified to explain their work. Both Mr. Ulrich and Mr. Tapanen were unable to answer a number of questions or explain what was done, leaving the court with uncertainty about the assumptions and the work involved.

Where the appraiser testifying is not the one that prepared the work or the exhibit, he or she must be thoroughly familiar with the underlying assumptions or the court can give the testimony little weight. *See Astoria Plywood Corp. v. Dept. of Rev.*, 6 OTR 40, 50 (1975).

Mr. Slack likewise relied on Consilium's equipment listing and the used equipment market. His estimates of depreciation also included functional and economic obsolescence. Depreciation based on "normal lives" or other such measure requires the court to consider economic and functional obsolescence. The statute prohibits this. Likewise, the court finds that the used equipment market is largely irrelevant in this case.

One perspective is to consider the reproduction cost new without depreciation of any kind. There is some evidence that a reproduction cost new of 15 cents per pound of capacity might be reasonable. This would result in a reproduction cost new for the subject plant of approximately $46,000,000 to $48,000,000. Since all of the parties agree that the subject is a state-of-the-art plant suffering essentially no economic or functional obsolescence, the only deduction from this reproduction cost would be physical depreciation. Neither side produced evidence of pure physical depreciation.[5] Due to the nature of the approaches and the evidence adduced, this is not a case where the court finds it can adjust the values found by the appraisers. Accordingly, the court accepts defendant's $46,000,000 for 1984 and $43,000,000 for 1985 and 1986 as the most reliable estimate of the ORS 308.411 value of the subject property by the cost approach.

## SALES COMPARISON APPROACH

As indicated above, the sales comparison approach can be given little, if any, weight. Mr. Gamache testified for Simplot that the subject plant would have a reproduction cost new equal to 15 cents per pound of production. Mr. Gamache used 6.8 cents per pound of production. This indicates physical depreciation of 55 percent. The court cannot accept that a

---

[5] Defendant's appraiser, Ms. Daniell, erroneously believed defendant was entitled to "consider obsolescence from all sources" and stated, "I believe that the depreciation lives that we have assigned include some functional obsolescence * * *."

Steven H. Corey, Corey, Byler, Rew, Lorenzen & Hojem, Pendleton, represented plaintiff/intervenor J. R. Simplot Co.

Marilyn J. Harbur, Assistant Attorney General, Department of Justice, Salem, represented defendant.

Richard A. Hayden, Bogle & Gates, Portland, represented Lamb-Weston, Inc., intervenor.

No appearance by plaintiff Umatilla County.

Decision for defendant rendered May 3, 1993.